UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| MARILYN KELLY, derivatively on behalf of Polaris Industries, Inc., Plaintiff, | ) Case No.<br>)<br>)<br>) |
| vs. | )<br>) |
| SCOTT W. WINE, ANNETTE K. CLAYTON, KEVIN M. FARR, GARY E. HENDRICKSON, GWENNE HENRICKS, BERND F. KESSLER, LAWRENCE D. KINGSLEY, JOHN WIEHOFF, MICHAEL T. SPEETZEN, MICHAEL W. MALONE, KENNETH J. PUCEL, MATTHEW J. HOMAN, BENNETT J. MORGAN, DAVID C. LONGREN, Defendants, | ) __DEMAND FOR JURY TRIAL__<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| and | )<br>) |
| POLARIS INDUSTRIES, INC., Nominal Defendant. | )<br>)<br>)<br>) |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## I.  INTRODUCTION

1.     This is a shareholder derivative action (the "Action") on behalf of Polaris Industries, Inc. ("Polaris," or the "Company") and against certain of its current directors (the "Board"), and current and/or former officers (collectively with the Board, the "Individual Defendants")[1] for breach of fiduciary duty and other misconduct during the period from February 20, 2015 to the present (the "Relevant Period").

2.     As detailed herein, the Individual Defendants caused Polaris to issue false and misleading statements and omissions during the Relevant Period concerning the existence, nature and magnitude of the risks to the Company (as well as to its customers and investors) resulting from defects in its Off-Road Vehicles ("ORV"). Throughout the Relevant Period, the Individual Defendants caused Polaris to engage in a misleading course of business that concealed or deliberately understated the impact of the defects and related recalls on sales and demand for its products, and overstated the Company's investigation into the defects, and its ability to protect and expand its market share based on sales of new ORV models and products with the same or similar undisclosed defects.

3.     During the Relevant Period, Polaris recalled more than 200,000 ORVs that had been manufactured from 2012 through 2016.[2] The recalls affected Polaris' most significant ORV models, including the high-powered RZR 900, RZR 1000 and RZR XP Turbo models that were the cornerstone of the Company's plans to grow ORV sales and revenues and combat competition from other manufacturers. The majority of the defects arose from a common set of problems and conditions, which caused Polaris' ORVs to catch on fire due to, among other causes, faulty heat shields, leaking fuel or oil, and overheated engines. Upon information and belief, the defects were

---

[1]     As used herein, the term "Defendants" collectively includes Polaris and the Individual Defendants.

[2]     As detailed herein, Polaris' problems with vehicle recalls has now expanded to vehicles (and/or parts) manufactured after, or for model years after, 2016 as well.

caused by bad designs that the Defendants rushed to market without proper vetting.  The defects were further exacerbated by poor manufacturing practices and quality control procedures.

4.      Prior to and during the Relevant Period, the Individual Defendants received, and were on notice of, repeated notices of fire dangers affecting Polaris products through, among other things, lawsuits, online postings and social media where incidents were being reported. Shockingly, despite the repeated reports of fires affecting Polaris products, the Individual Defendants never caused Polaris to warn investors of the risks to its business arising from those events. Throughout the Relevant Period, the Individual Defendants instead caused Polaris to repeat generic warnings about recall risks, and represented that there had been "no material change" in those generic recall risks even as more fires were reported, and product recalls were imminent.

5.      The materially misleading statements and course of conduct complained of herein caused the Company, and its investors, to suffer millions of dollars in economic harm when the defects in the products, and scope of injuries caused by the products, were revealed via recalls and, eventually, the resulting adverse financial impact to the Company.  As detailed herein, by the end of the Relevant Period, the defects caused Polaris to cut its guidance nearly in half, with the Individual Defendants finally causing the Company to admit that the reduction was due to lost sales and weak demand caused by the recalls, leading to, among other things, increased costs for warranty and product liability claims.

6.      Plaintiff's allegations are based upon the investigation of plaintiff's counsel, including information contained on Polaris' website or in its SEC filings and other regulatory filings and reports, advisories about the Company, press releases, conference call transcripts and other public statements issued by the Company, as well as media reports and other sources of information about the Company.[3]

_____

[3]      Polaris and certain of the Individual Defendants have been named in a securities fraud class action pending in the District of Minnesota entitled *In re Polaris Industries, Inc. Securities Litigation*, Master File No. 0:16-cv-03108-PAM-SER (the "Class Action").  The operative

## II.     JURISDICTION & VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and/or countries and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the Defendants either resides in or maintains executive offices in this District, and the Individual Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.   Additionally, Polaris is headquartered in this District.

## III.     PARTIES

9.     Plaintiff Marilyn Kelly (the "Plaintiff") is a current shareholder of Polaris common stock, and has continuously held Polaris common stock since at least the time of the Company's initial public offering (the "IPO") in 1994.  As of the date this Action was initially filed, Plaintiff is a citizen of Florida.

10.     Defendant Polaris is a Minnesota corporation, with its headquarters in Medina, Minnesota.  Polaris' principal business is the design, manufacture and sale of ORVs, snowmobiles and motorcycles, as well as related parts, accessories, and garments. Polaris shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PII."  The Company's website

---

complaint in the Class Action includes allegations based on information reportedly provided to counsel in that action by former employees who are identified descriptively therein as "confidential witnesses."

([www.polaris.com](www.polaris.com)) contains links to an Investor Relations website where certain SEC filings, financial information, press releases, and other information about the Company is provided.

11.     Defendant Scott W. Wine ("Wine") is the Chairman of the Board, and the Chief Executive Officer ("CEO") of Polaris.  Wine has served as a director of the Company since 2008. At all times during the Relevant Period, Wine served on the Technology Committee of the Board (the "Technology Committee").  Prior to becoming Polaris' CEO, he was the President of Fire Safety Americas, the Fire & Security division of United Technologies Corp.  As of the date this Action was initially filed, Wine is a citizen of Minnesota.

12.     Defendant Annette K. Clayton ("Clayton") has served as a director of the Company since 2003.  During the Relevant Period, Clayton served on the Board's Compensation Committee (the "Compensation Committee") and the Technology Committee (serving as Chair of the Technology Committee from 2015 through 2017).  As of the date this Action was initially filed, Clayton is a citizen of Texas.

13.     Defendant Kevin M. Farr ("Farr") has been a director of the Company since October 2013.  At all times during the Relevant Period, Farr has served as Chair of the Board's Audit Committee (the "Audit Committee"), and also has served during such period on the Technology Committee.  As of the date this Action was initially filed, Farr is a citizen of California.

14.     Defendant Gary E. Hendrickson ("Hendrickson") has been a director of the Company since 2011.  During the Relevant Period, Hendrickson served as Chair of the Compensation Committee and as a member of the Board's Corporate Governance and Nominating Committee (the "Governance Committee").  As of the date this Action was initially filed, Hendrickson is a citizen of Minnesota.

15.     Defendant Bernd F. Kessler ("Kessler") has served as a director of the Company since 2010.  During the Relevant Period, Kessler served on the Technology Committee, the Governance Committee, and the Audit Committee.  As of the date this Action was initially filed, Kessler is a citizen of Arizona.

4

16.     Defendant Gwenne Henricks ("Henricks") has served as a director of the Company since July 22, 2015.  After joining the Board, Henricks served on the Audit Committee and the Technology Committee during the Relevant Period.  As of the date this Action was initially filed, Henricks is a citizen of Illinois.

17.     Defendant Lawrence D. Kingsley ("Kingsley') has served as a director of the Company since January 28, 2016.  After joining the Board, Kingsley served on the Audit Committee and on the Technology Committee during the Relevant Period.  As of the date this Action was initially filed, Kingsley is a citizen of New York.

18.     Defendant John Wiehoff ("Wiehoff") has been a director of the Company since 2007.  During the Relevant Period, Wiehoff served on the Audit Committee, the Compensation Committee, and as Chair of the Governance Committee.  As of the date this Action was initially filed, Wiehoff is a citizen of Minnesota.

19.     Defendant Michael T. Speetzen ("Speetzen") joined Polaris on August 3, 2015 as CFO and Executive VP of Finance.  As of the date this Action was initially filed, Speetzen is a citizen of Minnesota.

20.     Defendant Michael W. Malone ("Malone") served as Polaris' CFO and Executive VP of Finance from the start of the Relevant Period until August 3, 2015.  As of the date this Action was initially filed, Malone is a citizen of Minnesota.

21.     Defendant Kenneth J. Pucel served as Polaris's Executive Vice President of Operations, Engineering during the Relevant Period.  As of the date this Action was initially filed, Pucel is a citizen of Minnesota.

22.     Defendant Matthew J. Homan has served as Polaris' President of Off-Road Vehicles. Homan has been President of ORV since January 2016.  Homan was President of Global Adjacent Market from September 2015 to January 2016 and Vice President of Global Adjacent Market from July 2014 to September 2015.  As of the date this Action was initially filed, Homan is a citizen of Minnesota.

23.      Defendant Bennett J. Morgan was Polaris' President and Chief Operating Officer from 2005 until he left the Company in May 2016.  As of the date this Action was initially filed, Morgan is a citizen of Minnesota.

24.      Defendant David C. Longren was Polaris' Senior Vice President of Enterprise Cost from January 2016 until September 6, 2016. Prior to that role, Longren was President of ORV and ORV Engineering from September 2015 to January 2016, when he was replaced by Homan. Longren was Vice President of ORV and ORV Engineering from August 2011 until September 2015.  As of the date this Action was initially filed, Longren is a citizen of Minnesota.

25.      The Company and the individuals named in ¶¶11-24 are referred to herein collectively as the "Defendants".  The individuals named as defendants in ¶¶11-24 are referred to herein as the "Individual Defendants."   The individuals named as defendants in ¶¶11-18 are referred to herein as the "Board" or the "Demand Directors".

26.      Non-party director George W. Bilicic was appointed to the Board on August 18, 2017.

## IV.      THE INDIVIDUAL DEFENDANTS' DUTIES

27.      By reason of their positions as officers, directors, and/or fiduciaries of Polaris and because of their ability to control the business and corporate affairs of Polaris, the Individual Defendants owed Polaris and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Polaris in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Polaris and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Polaris and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Polaris, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Polaris, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

(a)     To discharge their duties, the officers and directors of Polaris were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Polaris were required to, among other things:

(b)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

29.     According to the Company's website as of the date this Action was initiated, the Audit Committee's primary purposes are described, in pertinent part, as being to:

• Assist Board oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, (4) the responsibilities, performance, budget and staffing of the Company's internal audit function, and (5) the performance of the Company's independent auditor.

• Prepare the report that the Securities and Exchange Commission ("SEC") rules require to be included in the Company's annual proxy statement.

•Serve as an independent and objective party to monitor the Company's financial reporting process and internal control system.

•Provide an open avenue of communication among the independent auditor, financial and senior management, the internal auditors and the Board of Directors.

30.     Specifically, the Audit Committee Charter, revised as of January 26, 2017,[4] provides, in pertinent part as follows, these specific duties and responsibilities as to financial reporting and disclosure matters:

> 1.      Review and discuss with management and the independent auditors the Company's interim unaudited and annual audited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operation," the results of the independent auditor's review (or audit in the case of annual financial statements) and any other matters required to be communicated to the Committee by the independent auditor, prior to filing each Form 10-Q or 10-K, respectively. Based on such review, determine whether to recommend to the Board the annual audited financial statements be included in the Company's Annual Report filed under the rules of the SEC.  The Committee shall also prepare the report required by the SEC to be included in the Company's annual proxy statement and any other Committee reports required by applicable securities laws or stock exchange listing requirements or rules.

> 2.      In consultation with the Company's independent auditor and internal auditors, monitor the integrity of the Company's financial reporting processes, both internal and external. This shall include the review of major issues regarding significant changes to the Company's accounting principles and practices, financial reporting process and presentations, and system of internal controls, as suggested by the Company's independent auditor, management, or the internal auditors.

> 3.      Review with management, the independent auditor, the internal auditors and the Company's legal counsel, as appropriate, any legal, regulatory or compliance matters . . . .

> 4.      Review the systems of reporting to the Committee by management, the independent auditor, and the internal auditors regarding any significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including the effect of alternative GAAP methods, and

---

[4] Upon information and belief, the duties described in the charter applied in material part throughout the Relevant Period.

the view of each as to the appropriateness of such judgments.

5.     Discuss with management the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as review any financial information and earnings guidance provided to analysts and rating agencies prior to public release.

6.     Discuss with the independent auditor the matters required to be discussed by applicable auditing standards relating to the conduct of the audit.

7.     Review all related party transactions approved by the Corporate Governance and Nominating Committee of the Board that are required to be disclosed pursuant to SEC Regulation S-K, Item 404, understanding the business rationale for the transactions and whether appropriate disclosures have been made.

8.     Review with management and the internal auditors management's process for designing and implementing anti-fraud programs and controls, including the results of management's annual fraud risk assessment.

9.     Discuss with management and the internal auditors management's process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act, including any material weaknesses or significant deficiencies identified. Also discuss with management its remediation plan to address internal control deficiencies and determine that the disclosures describing any identified material weaknesses and management's remediation plans are clear and complete.

10.     Review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditor's report on the effectiveness of internal control over financial reporting.

11.     Discuss with management its process for performing its required quarterly certifications under Section 302 of the Sarbanes-Oxley Act, including the evaluation of the effectiveness of disclosure controls by the Chief Executive Officer and Chief Financial Officer.

12.     Discuss with management, the internal auditors, and the independent auditors any (1) changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting that are required to be disclosed, and (2) any other changes in internal control over financial reporting that were considered for disclosure in the Company's periodic filings with the SEC.

31.    According to the Company's website as of the date this Action was initiated, the Compensation Committee primarily:

. . .assists the Board in establishing a philosophy and policies regarding executive and director compensation, provides oversight to the administration of the Company's director and executive compensation programs and administers the Company's stock option, restricted share and other equity based plans, reviews the compensation of directors, executive officers and senior management, and prepares any report on executive compensation required by the rules and regulations of the Securities and Exchange Commission (the "SEC") or other regulatory body. The Committee shall also assist the Board in management development and succession planning.

32.    Specifically, the Compensation Committee Charter, amended and restated as of July 2, 2013, provides, in pertinent part, as follows:

The following are the duties and responsibilities of the Committee:

A.   Compensation:

1.    In consultation with the Board and senior management, establish the Company's director and executive compensation philosophy, and oversee the development and implementation of director and executive compensation programs.

2.    Review and approve, after consultation with the Board, corporate goals and objectives relevant to the compensation of the Chief Executive Officer, evaluate the performance of the Chief Executive Officer in light of those goals and objectives and any other criteria established by the Board, and together as a Committee or together with the other Independent Directors of the Company (as directed by the Board) determine and approve the Chief Executive Officer's compensation level based on this evaluation.

3.    At the direction and subject to the oversight of the Board, the Chairman of the Compensation Committee shall negotiate the Chief Executive Officer's compensation package.

4.    Review and approve, after consultation with the Chief Executive Officer and Vice President—Human Resources, corporate goals and objectives for the senior executives of the Company (other than the Chief Executive Officer), evaluate the performance of the non-CEO executive officers in light of those goals and objectives and any other criteria established by the Committee, and together as a Committee determine and approve the non-CEO executive officers' compensation level based on this evaluation.

10

5.      Review and approve, after consultation with the Chief Executive Officer and Vice President—Human Resources, awards under the Company's incentive compensation plans and equity-based plans; oversee the activities of the individuals and committees responsible for administering these plans; and discharge any responsibilities imposed on the Committee by any of these plans.

6.      In consultation with senior management, oversee regulatory compliance with respect to compensation matters, including overseeing the Company's policies on structuring compensation programs to preserve tax deductibility, and, as and when required, establishing performance goals and certifying that performance goals have been attained for purposes of Section 162(m) of the Internal Revenue Code.

7.      Review and discuss with management the Company's proposed disclosures under "Compensation Discussion and Analysis" and, based on such review and discussion, recommend to the Board that the Company's "Compensation Discussion and Analysis" be included in the Company's proxy statement or annual report on Form 10-K for filing with the SEC.

33.     According to the Company's website as of the date this Action was initiated, the Governance Committee:

. . . provides oversight and guidance to the Board of Directors to ensure that the membership, structure, policies and processes of the Board and its committees facilitate the effective exercise of the Board's role in the governance of the Company. The Committee reviews and evaluates the policies and practices with respect to the size, composition and functioning of the Board and its committees; identifies individuals qualified to become Board members, consistent with criteria approved by the Board; recommends potential director nominees to the Board for election by the shareholders after evaluating the qualifications of possible candidates for the Board; develops and recommends to the Board a set of Corporate Governance Guidelines applicable to the Company; and oversees the evaluation of the Board.

34.     According to the Company's website as of the date this Action was filed, the Technology Committee "assists the Board by overseeing the Company's product plans, technology development and related business processes."  Specifically, the Technology Committee Charter, revised as of October 20, 2006, provides that the Committee's primary focus is to:

(a)     "Review the Company's product and technology development plans to ensure the continuous flow of innovative, differentiated, leadership products in the markets currently served by the Company."

(b)     "Review the Company's plan for growth through new products serving adjacent markets."

(c)     "Review new technology development, and plans for insertion of new technology into the long-range product plan (LRPP)."

(d)     "Review major competitive moves such as disruptive products and technology and manufacturing sources and review the Company's response plans."

(e)     "Review the adequacy of the processes, tools, facilities and technology leadership connected with product and technology development."

(f)     "Review the costs, benefits and risks associated with major product development programs and related facility investments."

(g)     "Review the Company's plans to address changing regulatory requirements."

(h)     "Review the Company' strategic sourcing plans for products and technology. "

(i)     "The committee also monitors the Company's quality initiatives to ensure that the quality of Polaris products meets or exceeds customer expectations and continues to strengthen the Polaris brand name."

## V.     OVERVIEW OF POLARIS' OPERATIONS AND THE INDIVIDUAL DEFENDANTS' MISCONDUCT DURING THE RELEVANT PERIOD

### A.     Polaris' Business Depends on Successful Sales of its Off-Road Vehicles

35.     In the early 1950s, Polaris' predecessor, Polaris Industries Partners, L.P., began as a snowmobile designer and manufacturer. Polaris became a public company via an IPO in 1994.[5]

---

[5] From September 1987 to December 1994, Polaris was listed on the NYSE as a Master Limited

As the Company grew over time, Polaris expanded its business, primarily through the design and manufacture of ORVs. The Company sells its products primarily through dealers and distributors located in the United States, Canada, Western Europe, Australia and Mexico.

36.     According to Polaris' fiscal year 2014 ("FY 2014") annual report issued at the outset of the Relevant Period, at year end December 31, 2014, ORVs accounted for 65% of the Company's annual sales, as compared with snowmobiles (7%), motorcycles (8%), other small vehicles (3%) and parts, garments and accessories (17% combined). ORVs, including Polaris' RANGER and RZR models (as well as the GENERAL vehicles), have become the source of a majority of Polaris' revenue.

37.     Upon information and belief, during the Relevant Period, it was the Individual Defendants' general practice to have Polaris introduce its new model year products at a dealer show held a week or two after issuing its earnings report for the second quarter of the fiscal year. The Defendants would often hold Polaris' annual investor and analyst meeting during the event in view of the attention generated by dealer shows.

38.     Leading into the Relevant Period, Polaris enjoyed an industry-leading position and brand name recognition that afforded the Company a significant competitive advantage in the market, as its vehicles had a historical track record of favorable design and performance. Maintaining this reputation, given the retail nature of its business, was critical to Polaris' ability to maintain market share.  Recalls, product liability lawsuits and other adverse safety related events for consumers using Polaris products were matters that, unsurprisingly, could materially decrease Polaris' ORV market share.  In addition, Polaris was facing increased competition by the start of the Relevant Period from foreign manufacturers.  Accordingly, as set forth herein, it was critical to the Individual Defendants to repeatedly assure investors that, through new product introductions and other actions the Company was taking, that they were succeeding in retaining and expanding

---

Partnership.

Polaris' ORV market share. Equally critical to the Individual Defendants was the need to limit disclosure of product recalls, lawsuits related to customer injuries and/or deaths, or other negative product news.

### B.  Defendants Knew, and/or Were on Notice Of, Fire Dangers Connected to Operation of Polaris Vehicles Long Before ORV Recalls Were Announced

39.  As detailed herein, the Individual Defendants were on notice of the need for Polaris to undertake, or consider undertaking, product recalls in advance of when the recalls were formally announced. Specifically, the Individual Defendants caused Polaris to use social media to market its products – which, in turn, provided a channel of available information, most of which funneled directly into the Company, as to the problems with the products. Upon information and belief, Polaris also tested products in response to problems before recalls were formally announced. Social media, warranty claims, litigation demands, lawsuits, the CPSC, internal testing, or other channels all provided a steady stream of information to put the Individual Defendants on notice of the need for a recall of products.

40.  Indeed, both prior to, and during the Relevant Period, in connection with their respective roles at Polaris, the Individual Defendants were on notice of the fire risks regarding Polaris products through various warranty claims and lawsuits. For example:

    (a)  On March 16, 2012, a Polaris customer riding a new 2012 RZR XP 900 reported that the vehicle caught fire on/near the exhaust manifold. The customer described the incident in a letter to Polaris in late March 2012 and on www.saferproducts.gov, a website run by the U.S. Consumer Product Safety Commission ("CPSC") in April 2012. Polaris denied liability and denied that the "RZR contains any defect which could create a substantial product hazard or does create an unreasonable risk of death or serious injury."[6]

    (b)  On September 27, 2012, the owner of a 2012 Polaris RZR 800 filed a report on SaferProducts.gov stating that the vehicle's exhaust was melting the plastic cargo bed and that the bed was too hot to touch.[7] On October 19, 2012, Polaris responded to the report and stated that it had spoken with the

---

[6]    SaferProducts.gov (Apr. 14, 2012), https://tinyurl.com/hbey5gf.

[7]    SaferProducts.gov (Sept. 27, 2012), https://tinyurl.com/jpcnvej.

customer and directed him to take the RZR to a dealer. Polaris admitted receipt of similar complaints of deformation of plastic in the bed area of vehicles.

(c)     On November 1, 2012, a Polaris 2012 RZR XP 900 owner was driving his vehicle in sand dunes when the RZR caught fire and burned to the ground. He reported the incident on www.saferproducts.gov on November 3, 2012 and a few weeks later, Polaris posted a response.[8]  Polaris stated that it had "conducted an on- site investigation concerning this issue," but that the "root cause of the issue could not be determined at this preliminary investigation."[9] Polaris also noted that the RZR was being returned to the Company for further investigation and that it was continuing its discussions with the owner.[10]

(d)     On June 3, 2013, the owner of a 2012 Polaris RZR4 800 with less than 500 miles was driving the vehicle when he discovered that the rear cargo bed of the vehicle, which is positioned above the engine and exhaust, had melted. The owner reported the incident on SaferProducts.gov and to Polaris in October 2013 and noted that Polaris had agreed to provide a replacement cargo bed.[11] On November 5, 2013, Polaris responded to the customer's report on saferproducts.gov, stating that it had agreed to replace the melted cargo bed.

(e)     On July 19, 2013, the owner of a Polaris RANGER 800 reported on saferproducts.gov that the seat of her Polaris becomes so hot that she has to stop riding to avoid being burned.[12] She noted that she had a red mark on her back from where she was sitting on the hot seat. On August 5, 2013, Polaris responded to the report and stated that there was nothing abnormal going on and that to avoid the problem, the rider just had to wear appropriate clothing.

(f)     In April 2015, the parents of a minor, severely burned and left disfigured, when a gap in the fuel tank vent line of the 2010 RANGER 800 Crew EFI UTV she was riding caught fire after the vehicle flipped over in July 2014, sued Polaris in the U.S. District Court for the Northern District of Texas, alleging that Polaris had improperly designed the gasoline tank vent tube in a way that allowed gasoline to pour from tank on to the hot engine in the event of a rollover. Polaris settled the case in late 2016 after the Court granted the plaintiffs' motion to compel a Rule 30(b)(6) deposition of a

---

[8]     SaferProducts.gov (Nov. 3, 2012), https://tinyurl.com/jgf9kgg.
[9]     *Id.*
[10]    *Id.*
[11]    SaferProducts.gov (Oct. 22, 2013), https://tinyurl.com/j7beome.
[12]    SaferProducts.gov (July 19, 2013), https://tinyurl.com/zcsnhhs.

Polaris representative. *See* docket in *Latham, et al. v. Polaris Industries, Inc.*, Case No. 3:15-cv-01209-B (N. D. Tex.).

(g)    On July 4, 2015, a minor passenger on a Polaris RZR 900 was severely burned when the vehicle rolled over and caught fire. A news report, dated August 27, 2015, stated that Polaris acknowledged that it was "'actively investigating'" the incident.[13] The victim of the RZR fire died of her injuries several months later in November 2015.[14]

41.    The Individual Defendants also had access to the many videos posted to YouTube showing RZRs on fire, including videos uploaded on November 1, 2012 (https://tinyurl.com/hgm74b2); December 1, 2013 (https://tinyurl.com/jozcypc); May 4, 2014 (https://tinyurl.com/z23p3uu); September 11, 2015 (https://tinyurl.com/zvom5te); and February 15, 2016 (https://tinyurl.com/hftqc66).

### C.    The Individual Defendants Caused Polaris to Downplay Risks of its Products to Customers and Investors While Undertaking Recalls

42.    While under the control of the Individual Defendants, Polaris recalled more than 200,000 vehicles (manufactured between 2012 and 2016) during the Relevant Period for a related series of problems that caused its vehicles to catch on fire, sometimes with fatal consequences. The problems affected Polaris' most powerful and most important products, including the RZR Turbo and other high horsepower vehicles it had rushed to market to diffuse competitive inroads from Can-Am and other manufacturers. As Defendant Wine stated on the Company's July 20, 2016 conference call, there were "gaps in [Polaris'] design, development, and manufacturing processes."

---

[13]    Caroline Connolly, Attorney for family of teen girl severely burned in crash says Polaris should consider vehicle recall, FOX 13 Salt Lake City (Aug. 27, 2015, 9:25 PM), https://tinyurl.com/zcsphxb.

[14]    Jessica Miller, Provo teen taken off life support months after fiery crash, The Salt Lake Tribune Nov. 17, 2015, 11:00 AM), https://tinyurl.com/hvohxwm.

43.     The following chart lists certain recalls of Polaris' products during the Relevant Period (including, but not limited to, the more than 200,000 vehicles recalled where injuries were due in large part to fire hazards): [15]

| Date Announced | Models | No. Vehicles Recalled |
|---|---|---|
| 7/23/15 | 2015 Youth RZR | 4,300 |
| 10/5/15 | 2015 RZR 1000/RZR 900 | 53,000 |
| 12/10/15 | 2016 RZR XP Turbo | 2,230 |
| 4/19/16 | 2013-2016 RZR 1000/RZR 900 | 160,000 |
| 6/28/16 | 2015-2016 RANGER 570 | 43,000 |
| 7/25/16 | 2016 RZR XP Turbo (Stop Ride/Stop Sale advisory) | Not stated |
| 9/1/16 | 2016 RZR XP Turbo (Recall) | 13,000 |
| 9/15/16 | 2014 RANGER 900 | 42,500 |
| 3/2/17 | 2016-2017 RZR 900/1000/XP Turbo; GENERAL 1000 | 13,500 |
| 4/13/17 | 2017 Sportsman 450, 570, 850, 1000 & Scrambler 1000 | 3,800 |
| 7/18/17 | 2017 RZR 570/RZR S 570 | 1,160 |
| 7/19/17 | 2014 Sportsman 570 | 25,600 |
| 7/25/17 | 2015-2017 RZR 170 | 16,800 |
| 8/8/17 | 2014-2017 Scrambler XP 1000 | 2,800 |

44.     Despite the consistent pattern of fires, lawsuits and fire hazard recalls related to its revenue-driving RZR and RANGER ORVs, the Individual Defendants repeatedly caused Polaris to downplay the risk of the recalls to Polaris' profitability and market dominance, falsely assuring investors and customers that the problems were limited, the Company had a firm grasp on their causes and likely impact, and that the issues did not present any significant or unusual risks to its business.

---

[15] Each of these recalls has been documented in press releases by Polaris and/or the U.S. Consumer Product Safety Commission (the "CPSC").

17

45.     Throughout the Relevant Period, a pattern emerged in which Polaris would announce a recall, and then the Individual Defendants would cause the Company to assure investors that the impact was limited, and then, weeks later, release poor financial reports and/or reduced guidance. In each of these circumstances, the Individual Defendants would cause Polaris to tell investors that the weak performance or lowered expectations was due to macro-economic conditions or weakening industry demand, when in fact the events reflected the increased expenses and reduced sales caused by the previously announced recalls as well as ongoing investigations that would lead to later recall announcements, as previously alleged.  In some instances, the Individual Defendants would simply cause Polaris to time its recall announcement to coincide with expected positive announcements, such as the introduction of new products, so that the negative impact of the news would be substantially reduced or eliminated.

46.     Most of the recalls of Polaris' products were announced jointly, or in coordination, with the CPSC. Although Polaris' recalls may be labeled as "voluntary", the recalls resulted from statutory requirements for manufacturers to provide notice to the CPSC of defects that created an unreasonable risk of serious injury or death to consumers.

47.     Pursuant to §15 of the Consumer Product Safety Act, manufacturers, importers, distributors and retailers of consumer products, including ORVs, are subject to certain reporting requirements when products may contain a dangerous defect. When a company subject to §15 obtains information that reasonably supports the conclusion that a product in commerce contains a defect which could create a substantial product hazard or creates an unreasonable risk of serious injury or death, the company must immediately notify the CPSC.  According to the CPSC's Recall Handbook, reporting "immediately" means reporting product safety related information within 24 hours of receiving that information.[16] The CPSC considers a company to have received reportable information "when that information is received by an employee or official of the firm who may

---

[16]     CPSC, *Recall Handbook* (Mar. 2012), https://tinyurl.com/h6lqxbu.

reasonably be expected to be capable of appreciating the significance of that information." *Id.* Once that employee or official received that information, "five working days is the maximum reasonable time for that information to reach the chief executive officer or the official assigned responsibility for complying with the reporting requirements." *Id.*

48.    For several years leading up to the Relevant Period, in response to customer reports of sudden ORV fires, the Individual Defendants would cause Polaris to consistently deny that the customer reports were reportable incidents of defects that could create a substantial product hazard or unreasonable risk of death or serious injury. Otherwise, such reports would trigger a duty to recall the product. For example in response to a 2012 customer report of a RZR XP 900 that suddenly caught on fire, the Individual Defendants caused Polaris to respond that "[t]he consumer's report does not reasonably support a conclusion that the RZR contains any defect which could create a substantial product hazard or does create an unreasonable risk of death or serious injury."[17] The Individual Defendants caused Polaris to similarly respond to a customer's 2014 report that his RANGER caught fire: "Polaris' investigation into the allegation does not reveal any evidence to suggest the product contained a defect which could create a substantial product hazard or created an unreasonable risk of serious injury or death."[18]

**D.    The Individual Defendants Caused Polaris' Warranty Reserves To Be Misleading**

49.    Polaris warranted its ORVs for a period of six months. ORV warranties required the Company to repair or replace defective products at no cost to the consumer only within the warranty period.

50.    The Individual Defendants caused Polaris to represent to investors in its reports on Forms 10-Q and 10-K during the Relevant Period that it established and regularly re-evaluated its warranty reserves according to the following policy:

---

[17]    SaferProducts.gov (Apr. 14, 2012), https://tinyurl.com/hbey5gf.
[18]    SaferProducts.gov (Jan. 10, 2014), https://tinyurl.com/z82vymt.

The warranty reserve is established at the time of sale to the dealer or distributor based on management's best estimate using historical rates and trends. Adjustments to the warranty reserve are made from time to time as actual claims become known in order to properly estimate the amounts necessary to settle future and existing claims on products sold as of the balance sheet date. Factors that could have an impact on the warranty accrual in any given period include the following: improved manufacturing quality, shifts in product mix, changes in warranty coverage periods, snowfall and its impact on snowmobile usage, product recalls and any significant changes in sales volume.

51.    Throughout the Relevant Period, the Individual Defendants also caused Polaris to fail to timely adjust its warranty reserve balances in accordance with its stated policies. This concealed from investors the true impact of and financial risks resulting from the repeated recalls of its products. It was not until the end of the Relevant Period that Polaris adjusted its warranty reserves in a manner that reflected the true magnitude of the risks arising from the recalls, taking the reserve to approximately $120 million at the third fiscal quarter of 2016 (the "3Q 2016").

52.    Indeed, on the 3Q 2016 earnings call that the Individual Defendants caused Polaris to hold on October 25, 2016, Defendant Speetzen admitted that Polaris had booked "additional warranty expense related to the execution of recalls as well as additional legal costs, totaling approximately $65 million," bringing total "warranty, legal and acquisition- related costs" to "approximately $120 million", which was primarily all related to the recalls alleged herein. The $120 million in costs was a dramatic increase from prior periods, as detailed herein.

53.    Defendant Wine said on the 3Q 2016 call that RZR recalls "have now passed the 50% penetration rate for both the RZR900/RZR1000 recall and the more recent Turbo recall." This further reflects that the costs incurred in the 3Q 2016 were not unanticipated earlier, including in April when Defendant Wine had said that the Company was then targeting at least a 50% penetration rate (and acknowledged that CPSC was pushing for 80%).

20

VI.   **THE INDIVIDUAL DEFENDANTS ISSUE, AND CAUSE POLARIS TO ISSUE, MATERIALLY FALSE AND MISLEADING STATEMENTS & OMISSIONS DURING THE RELEVANT PERIOD**

A.   **Fiscal Year 2014 Annual Report**

54.   On February 20, 2015, the Individual Defendants caused Polaris to file its annual report with the SEC on Form 10-K, describing its fiscal year 2014 ("FY 2014") results of operations (the "10-K FY 2014").[19]   Individual Defendants Wine, Clayton, Farr, Hendrickson, Kessler, Wiehoff and Malone signed (directly or via Wine as "Attorney in Fact") the 10-K FY 2014, which also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Individual Defendants Wine and Malone.   In the 10-K FY 2014, these Individual Defendants caused Polaris to report $2.9 billion in ORV sales, and touted Polaris' long track record of ORV sales growth:

> In 2014, we had record sales and net income, with our fifth straight year of double digit growth in both sales and net income. This growth is fueled by award-winning innovative new products leading to continued market share leadership in side-by-side vehicles and ATVs. In 2014, we also experienced growth in our snowmobiles, motorcycles, international and small vehicles businesses. The overall North American powersports industry continued its positive trend with mid-single digit percentage growth in 2014. Our North America retail sales to consumers increased 12 percent in 2014, helping to drive total full year Company sales up 19 percent to a record $4.48 billion.

55.   The 10-K FY 2014 provided the following statement or warning with respect to product recalls and defects:

> Significant product repair and/or replacement due to product warranty claims or product recalls could have a material adverse impact on our results of operations.

> We provide a limited warranty for ORVs for a period of six months, for a period of one year for our snowmobiles, for a period of one or two years for our motorcycles depending on brand and model year, and for a two year period for SVs. We may provide longer warranties related to certain promotional programs, as well as longer warranties in certain geographical markets as determined by local regulations and market conditions. We also provide a limited emission warranty for certain

_____
[19] The press release announcing the FY 2014 and fourth quarter 2014 ("4Q 2014") results was issued on January 27, 2015.

emission-related parts in our ORVs, snowmobiles, and motorcycles as required by the EPA and CARB. Although we employ quality control procedures, sometimes a product is distributed that needs repair or replacement. Our standard warranties require us or our dealers to repair or replace defective products during such warranty periods at no cost to the consumer. Historically, product recalls have been administered through our dealers and distributors. The repair and replacement costs we could incur in connection with a recall could adversely affect our business. In addition, product recalls could harm our reputation and cause us to lose customers, particularly if recalls cause consumers to question the safety or reliability of our products.

56.    The foregoing warning was substantially identical to the warning Polaris had included annual and quarterly reports it had issued before the Relevant Period.

57.    The foregoing statements were materially false and misleading because they omitted to disclose the fact that Polaris' reported growth in ORV sales had been achieved by the sale of (purportedly innovative) products that had significant design and manufacturing defects, including defects that had already caused fires and other injuries to Polaris' customers. The warning that Polaris' operating results could suffer if products had to be recalled was both misleading and ineffective, because it portrayed that risk as uncertain and contingent while omitting to disclose the defects in products that the Company had already shipped, or to describe the claims for fire-related problems that had been asserted. The risk warning was also misleading because it failed to disclose the deficiencies in Polaris' "quality control procedures," including that products were often rushed to market without sufficient testing and/or with parts that had not passed the Company's own quality-control standards. The statements were misleading because Polaris omitted to disclose the nature or existence of those defects, or the risks they posed to its customers, its reputation, and its financial condition and success, including the increased lawsuits and warranty expenses and reduced sales resulting from accidents caused by those defects and/or the lawsuits and negative publicity that could result.

58.    Indeed, as part of the effort to reassure investors, during the January 27, 2015 earnings conference call, Defendant Wine stated: "We expect RZRs and RANGERs to again gain

market share on the back of product innovations and Polaris' most engaged dealers and most passionate customers."

**B.     First Quarter 2015 ("1Q 2015") Earnings Release and Quarterly Report**

59.     On April 23, 2015, the Individual Defendants caused Polaris to issue a press release announcing results for the first fiscal quarter of 2015, ended March 31, 2015 ("1Q 2015").  The press release announced quarterly net income of $88.6 million, or $1.30 per diluted share, an increase of nine percent from the 2014 first quarter net income of $80.9 million, or $1.19 per diluted share.  Sales for the 1Q 2015 were reported as $1,033.3 million, a 16 percent increase from the first quarter of 2014 ("1Q 2014") sales of $888.3 million.

60.     The April 23, 2015 press release quoted Defendant Wine as stating:

I am pleased to report record sales and earnings for our 2015 first quarter, with sales up 16 percent, operating income up 19 percent and net income up nine percent, our 22nd consecutive quarter of record earnings performance. . . .We outperformed the market again in most of our businesses in spite of increased competitive promotional pressures, weakening global markets and the corresponding negative effect from currencies. While we are justifiably proud of these accomplishments, we remain focused on seizing the numerous opportunities we missed to perform better. From factory inventory being too high to ongoing production inefficiencies, particularly in motorcycles, we did not perform to our capabilities or our expectations. However, we are making great strides towards addressing these issues, and I am confident those efforts will allow us to continue outperforming our markets.

                        *       *       *

[W]e continue to see another year of solid growth and market share gains, which gives us confidence in achieving our sales and earnings guidance for the full year.

61.     The April 23, 2015 press release further stated that Polaris was "narrowing its guidance range and now expects earnings to be in the range of $7.27 to $7.42 per diluted share, an increase of 9 to 12 percent over full year 2014 earnings of $6.65 per diluted share. Full year 2015 sales are expected to grow in the range of 9 to 12 percent over full year 2014 sales, unchanged from previous issued sales guidance."  No mention was made in the press release of the ongoing problems Polaris was experiencing with fires related to its products.  Similarly, on the April 23,

2015 analyst conference call that the Individual Defendants caused Polaris to host (and which Defendants Wine, Morgan, Malone and Pucel attended), there was no mention of the ongoing reports of injury and fire in Polaris products.

62.     On April 30, 2015, the Individual Defendants caused the Company to file its 1Q 2015 report for the period ending on March 31, 2015 (the "10-Q 1Q 2015").  The 10-Q 1Q 2015 was signed by Defendants Wine and Malone, and contained SOX certifications by Wine and Malone.  In the 10-Q 1Q 2015, the Individual Defendants caused the Company to report quarterly ORV sales of $645.4 million and inform investors that:

> Our gross profit of $293.7 million increased 14 percent from $258.4 million in the comparable prior year period. The increase in gross profit resulted primarily from higher volume, increased selling prices and continued product cost reduction efforts, partially offset by negative currency impacts and unfavorable mix.

63.     The 10-Q 1Q 2015 included the following risk factor disclosure:

ITEM 1A – RISK FACTORS

> There have been no material changes or additions to our risk factors discussed in our fiscal 2014 Annual Report filed on Form 10-K. Please consider the factors discussed in "Part I, Item 1A. Risk Factors" in such report, which could materially affect the Company's business, financial condition, or future results.

64.     The statements made by the Defendants between April 23, 2015 and April 30, 2015, detailed above, were materially false and misleading because they omitted to disclose that the higher volume and increased selling prices that led to Polaris' reported growth in gross profit had been achieved through the sale of products like the RZR 900 and RZR 1000 that had significant design and manufacturing defects, including defects that had already caused fires and other injuries to Polaris' customers.  The foregoing statements were also misleading because the Individual Defendants caused Polaris to omit to disclose the nature or existence of defects affecting its products, or the risks they posed to its customers, its reputation, and its financial condition and success, including the increased lawsuits and warranty expenses and reduced sales resulting from accidents caused by those defects and/or the lawsuits and negative publicity that could result. The

24

assertion in the 10-Q 1Q 2015 that there had been no material changes in or additions to Polaris' risk factors was misleading because the risks of product recalls had increased due to continued incidents of fires involving RZR and other products. The warning in Polaris' 10-K FY 2014, that was incorporated into the 10-Q 1Q 2015, continued to be misleading and ineffective for the reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent, omitted to disclose the defects or describe the fire-related incidents that had occurred, and falsely assured investors that Polaris had adequate quality control procedures in place.

### C.   Second Quarter 2015 ("2Q 2015") Earnings Release And Quarterly Report

65.    On July 22, 2015, the Individual Defendants caused Polaris to issue a press release announcing its financial results for 2Q 2015, the period ending June 30, 2015.  The press release reported record second quarter sales and earnings, including net income of $100.9 million and EPS of $1.49 per diluted share for the quarter, and Defendants told investors that despite continued difficulties with the motorcycle paint system, the Company was confident that it would maintain and extend its market leadership in powersports.  Defendant Wine was quoted, in part, as stating:

> Innovation remains a cornerstone of Polaris' success, and at our dealer show next week we will introduce our model year 2016 powersports lineup that will further extend our market leadership. In spite of the short-term headwinds we are facing, both external and of our own making, I am confident this strong and talented Polaris team can continue to deliver industry-leading returns for our shareholders.

66.    The 2Q 2015 press release also provided the following increased guidance to investors:

### 2015 Business Outlook

> For the full year 2015, the Company is narrowing its earnings guidance range to $7.32 to $7.42 per diluted share, an increase of 10 to 12 percent over full year 2014 earnings of $6.65 per diluted share. Full year 2015 sales are now expected to grow in the range of 10 to 12 percent when compared to 2014, narrowed slightly from previously issued sales guidance.

67.    On July 22, 2015, the Individual Defendants caused Polaris to host a conference call to discuss its 2Q 2015 results of operations with investors and analysts. Defendants Wine,

Morgan, Malone, and Pucel each participated on the call, as did other Polaris officers. None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein.

68.     During the July 22, 2015 earnings conference call, Defendants Morgan and Wine told investors that Polaris was poised to maintain and grow its number one market share position in ORV, particularly with its upcoming 2016 ORV product line release:

> [MORGAN:] We gained share in ORVs in North America, gaining in both ATVs and side-by-sides and building upon our number one positions. Polaris ORV retail sales increased mid-single digits in an industry that increased slower but still grew mid-single digits.... We are less than a week away from our dealer meeting in Las Vegas when we will launch our 2016 model lineup, and we again have excellent product news across our entire ORV portfolio.

> \*      \*      \*

> [MALONE:] [T]he product news that we will reveal next week is probably, is just really right in line with what I think our dealers want and our customers want, which certainly should give us momentum as we go through the second half.

> \*      \*      \*

> [WINE:] [O]bviously we feel very, very, comfortable with our product pipeline and what you will see next week.

69.     Between July 23 and July 24, 2015, Polaris and the CPSC jointly announced a recall of 4,300 2015 Youth RZR models because the vehicles were at risk of catching fire due to a potentially faulty fuel pump retaining ring that could lead to fuel leaks. The recall was not disclosed in the 2Q 2015 earnings announcement or discussed on the 2Q 2015 conference call.

70.     The statements in the 2Q 2015 earnings release and on the 2Q 2015 conference call were materially false and misleading because they omitted to disclose the upcoming recall and that Polaris' ORV sales had been achieved through shipping defective products.

71.     On July 24, 2015, the Individual Defendants caused Polaris to file its 2Q 2015 Report on Form 10-Q with the SEC (the "10-Q 2Q 2015"). Individual Defendants Wine and Malone signed the 10-Q 2Q 2015, and also signed SOX certifications attached as exhibits thereto.

The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been re-evaluated to take into account changes in manufacturing quality, product recalls and other factors. The report disclosed that the Company had a warranty reserve balance of $45.1 million as of the end of 2Q 2015, which reflected a declining trend in warranty liability exposure from the amounts reported at the end of FY 2014 ($53.1 million) and 1Q 2015 ($48.6 million).

72.     The warranty reserve disclosures were materially false and misleading because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual to reflect the Company's exposure due to the product defects, declining manufacturing quality, product recalls, and the expenses to repair products whose warranties had already expired.

73.     The 10-Q 2Q 2015 made the following risk factor disclosure:

ITEM 1A – RISK FACTORS

There have been no material changes or additions to our risk factors discussed in our fiscal 2014 Annual Report filed on Form 10-K. Please consider the factors discussed in "Part I, Item 1A. Risk Factors" in such report, which could materially affect the Company's business, financial condition, or future results.

74.     The assertion in the 10-Q 2Q 2015 that there had been no material changes in or additions to Polaris' risk factors was misleading and ineffective because the risks of product recalls had materially increased due to continued incidents of fires involving RZR and other products, the increasing number of defective products that had been sold, and the impending recall of the Youth RZR and other products. The warning in Polaris' 10-K FY 2014 that was incorporated into the 10Q 2Q 2015 report continued to be misleading and ineffective for the reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent when Polaris had already suffered recall-related financial and reputational harm that had negatively impacted its business beyond what had been disclosed to investors, omitted to disclose the defects or describe the fire-related incidents that had occurred, and falsely assured investors that Polaris had adequate quality control procedures in place.   Notably, the Youth RZR recall was imminent when the Individual

27

Defendants issued the July 22 press release and earnings, but they specifically did not mention the recall, instead issuing it just days before the July 28, 2015 dealer and investor meeting (the "July 28 Show"), where new product launches – particularly of the anxiously-awaited RZR Turbo – would predictably overshadow the negative news of the recall.  Upon information and belief, Defendant Longren told investors and analysts at the July 28 Show, that, among other things, that Polaris' 2016 product models were "ready to go" and "in great shape":

> So Turbo, we announced that last night. First units are ready to ship today, okay. So across the board, all of our model year 2016 line-up is ready to go as we're introducing the product to be able to support the demand that we've created. Our products are in great shape, and it's about making sure we continue to grow our brands.

75.     For the reasons stated herein, the foregoing statements made in July 2015 were materially false and misleading because, among other things, they omitted to disclose the risks of injuries, reputational harm, declining sales and market share, rising warranty costs, and other negative consequences arising from the defects in Polaris' products, including by omitting to disclose that: (i) the risk of fires from design and manufacturing defects was not limited to the Youth RZR, but was also present on all of Polaris' other RZR products, and on many other ORV products it was selling, including the new model year products that had just been announced; (ii) Polaris' products had been rushed to market as a result of competitive pressures, without being thoroughly vetted or tested, and with substandard parts that had not complied with PII's own quality standards and requirements; and (iii) warranty cost trends were negative, not positive as represented, due to the existence of product defects, and the accidents and lawsuits that had already occurred and were highly likely to increase in the future.

**D.     October 5, 2015 Recall Announcement**

76.     On October 5, 2015, the Individual Defendants caused Polaris to issue the following press release announcing the recall of Model Year 2015 RZR 900 and 1000 ORVs:

> Polaris® Industries, in cooperation with the U.S. Consumer Product Safety Commission and Transport Canada, is issuing a voluntary recall on model year

2015 Polaris RZR 900 and 1000 vehicles due to reports of pinched fuel tank vent lines. The recall is related to the vehicle's fuel tank vent line potentially being incorrectly installed during manufacturing, causing it to become pinched, which may cause the fuel tank to pressurize and leak fuel, posing a potential fire hazard. Polaris estimates that the assembly error occurred in very few vehicles; however, Polaris is issuing a voluntary recall so that all these vehicles could be inspected and any affected vent lines fixed prior to further use.

Polaris is taking this action after confirming that, in some reports, a vent line had been pinched during assembly. In those cases, Polaris has also received reports of the driveline contacting a pressurized and expanded fuel tank, resulting in a fuel leak and a fire hazard. Polaris also received two reports of small fires, but could not confirm whether the vent line was obstructed during assembly or during subsequent accessory installation or whether the pinched vent line was the cause of the fires.

"Polaris is committed to the safety and quality of its products and is swiftly addressing the potential problem and has taken the appropriate steps to prevent any future occurrences," said Michael Erickson, Polaris' General Manager, RZR.

Polaris is sending a recall letter directly to each registered owner of a vehicle within the scope of this recall. All 2015 Polaris RZR 900 and 1000 vehicle owners will be asked to contact a dealer starting Oct. 5 to schedule a service appointment. There will be no cost to customers or dealers for this product inspection and fix.

Additionally, the company will provide information on the issue at Polaris Camp RZR in Glamis, Calif., Oct. 30 - 31, 2015.

77. There was no explanation in the press release as to why the recall was limited to model year 2015 vehicles, which were designed on the same platform as earlier model years. The press release that the Individual Defendants caused Polaris to issue was materially false and misleading because the problems were not limited to "very few vehicles" as asserted in the press release, nor were the problems caused by isolated "assembly error[s]" in the vehicles. As Polaris later admitted, the problems arose from defects in the design of the Polaris ORV and systemic problems in Polaris' manufacturing operations, affected numerous vehicles, and required repairs for which neither parts nor an effective fix were available. Thus, the Individual Defendants were not causing Polaris to "swiftly address[]" the problems nor had they identified what was needed, much less "taken the appropriate steps," to correct it. Upon information and belief, neither were

Defendants "'committed to the safety and quality of its products'"; they were instead committed to rushing new products to market as quickly as possible, before required safety or quality checks had been performed. The press release was also materially false and misleading because it omitted to disclose similar defects affecting other products and other model years, or to warn of the risks of injuries, reputational harm, declining sales and market share, rising warranty costs, and other negative consequences arising from the defects in Polaris' products.

78.    In the October 6, 2015 press release by the CPSC, it was noted that the recall related to approximately 53,000 2015 RZR 900 and 1000 models, and that Polaris had received reports of 29 fuel leaks and two fires before the recall.

**E.    Third Quarter 2015 ("3Q 2015") Earnings Release and Quarterly Report**

79.    On October 21, 2015, the Individual Defendants caused Polaris to issue a press release announcing its financial results for 3Q 2015, for the period ending September 30, 2015. Polaris reported earnings of $155.2 million ($2.30/share) for the quarter in the release. The Individual Defendants omitted to disclose the impact that the July and October recalls had on Polaris' results. Instead, the Individual Defendants caused Polaris to claim the slowing growth and disappointing numbers were a result of weakening macroeconomic conditions, sluggish oil and agricultural markets, capacity constraints and increasing competition.   In the 3Q 2015 press release, Defendant Wine was quoted as stating:

> "Our record third quarter results continue to reflect the efficacy of our long-term strategy and the resiliency of the Polaris organization, as motorcycle growth accelerated, ORV share gains continued and our developing adjacencies built momentum. We accomplished this in a difficult environment, with the combination of weakening currencies and softening economies adding to the pressure we face from the sluggish oil and agriculture markets, all in the midst of the most competitive powersports landscape we have seen in nearly a decade. It is encouraging to see our Polaris team use these challenging times to get better and stronger, while displaying renewed determination to win across all our markets," . . . "After our people, arguably our strongest asset is our innovative culture, which spurred the delivery of 15 new vehicles to our unsurpassed ORV armada and drove the introduction of hundreds of new PG&A items. We remain committed to being the leading innovator in our space."

80.     The 3Q 2015 press release also provided the following guidance to reassure investors, which represented an *increase* in projected annual EPS of $0.03/share at the midpoint from the guidance provided on the 2Q 2015 call:

**2015 Business Outlook**

> For the full year 2015, the Company is narrowing its earnings guidance range to $7.32 to $7.42 per diluted share, an increase of 11 to 12 percent over full year 2014 earnings of $6.65 per diluted share. Full year 2015 sales are now expected to grow in the range of 11 to 12 percent when compared to 2014.

81.     After issuance of the 3Q 2015 release, the Individual Defendants also caused Polaris to host an earnings conference call on October 21, 2015, to discuss the 3Q 2015 results. Defendants Wine, Morgan, Speetzen, and Pucel each participated on the call, as did other Polaris officers. None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein.

82.     During the October 21, 2015 call, Defendant Morgan reiterated the purported strength of Polaris' ORV sales and market share and its growing "armada" of ORVs:

> Year-to-date ORV revenue is up 5%. Q3 Polaris North American ORV retail sales increased to low-single digits.

> We again gained share in both ATVs and side-by-sides, adding further to our number one positions. Polaris ATV retail sales increased low single digits in an industry that declined slightly, while Polaris side-by-side retail sales grew low-single digits in an industry that also grew, but at a slightly slower pace than Polaris.

> New product introductions from Polaris and our competitors are fueling the intensely competitive atmosphere, including our recent announcement of four more new model year 2016 vehicles earlier this month. These, including the much-anticipated RZR XP 4 Turbo, are bolstering our broad and growing ORV armada. Our scale and speed to market remain competitive advantages, and we expect to add further to our armada over the next quarter, so stay tuned.

83.     Defendant Wine stated on the October 21, 2015 call, among other things, that: "Our metal is certainly being tested but we responded well, once again gaining side-by-side and ATV market shares."

84.     In response to questioning from analysts on the October 21, 2015 call, Defendants Morgan and Wine told investors there were no different or changed risks to its guidance, or reason to be concerned with its ability to accelerate sales in 4Q 2015:

> [ANALYST:] It seems that your off-road sales guidance for the year hasn't changed, but maybe came in a little bit light in Q3. So, with no change for the year, should we just be thinking of the similar in the existing range?

> *        *        *

> [MORGAN:] Again, I would tell you we feel very comfortable we'll be able to land our ORV guidance and deliver the dealer inventory levels and are confident in our ability to gain share in the retail. So while it might be a little bit lighter than you expected, I think it was right within our expectations the way we were looking at what we expected from that business in the third quarter.

> [ANALYST:] And you're expecting kind of an acceleration in Q4 in off-road?

> [MORGAN:] Yeah. I guess that would say the implied guidance, yeah, would be up slightly.

> [WINE:] Yes, mid-single digits.

85.     The foregoing statements issued in October 2015 were materially false and misleading because they omitted to disclose the extent to which reported sales and market share growth had been achieved through the sale of defective products, or to adequately warn of the true magnitude and extent of risks of injuries, reputational harm, declining sales and market share, rising warranty costs, and other negative consequences arising from the defects in Polaris' products. Nor did the statements fairly or accurately characterize the current risks to Polaris' from competition, or the extent to which sales and earnings had been impacted by the product recalls and related expenses. The 3Q 2015 guidance that the Individual Defendants caused Polaris to issue added to the misleading import of the other contemporaneous statements alleged herein, and was misleading in its own right, because it failed to factor in or apprise investors of the risk of reduced sales and earnings and higher costs that were reasonably expected to result from the recall, repair

or reduced demand caused by those defects and the reputational harm they had already caused to Polaris' brand and reputation.

86.     On October 27, 2015, the Individual Defendants caused Polaris to file its 3Q 2015 Report on Form 10-Q with the SEC (the "10-Q 3Q 2015").  Defendants Wine and Speetzen signed the 10-Q 3Q 2015, as well as the SOX certifications filed therewith.  The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been re-evaluated to take into account changes in manufacturing quality, product recalls and other factors. The report stated that the Company had a warranty reserve balance of $55.1 million as of 3Q 2015.

87.     The warranty reserve statements were materially false and misleading when made because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual in light of the July and October recalls of the MY2015 Youth RZR, RZR 1000 and RZR 900 products or the reasonably expected warranty expenses arising from claims, repairs and recalls of other Polaris products affected by the same or similar design and manufacturing defects, including the 2013 through 2016 RZR 900s and RZR 1000s and the 2016 RZR Turbo.

88.     The 10-Q 3Q 2015 contained the following statement:

ITEM 1A – RISK FACTORS

There have been no material changes or additions to our risk factors discussed in our fiscal 2014 Annual Report filed on Form 10-K. Please consider the factors discussed in "Part I, Item 1A. Risk Factors" in such report, which could materially affect the Company's business, financial condition, or future results.

89.     The assertion in the 10-Q 3Q 2015 that there had been no material changes in or additions to Polaris' risk factors was misleading and ineffective because the risks of product recalls had materially increased and already manifested due to continued incidents of fires involving RZR and other products, the increasing number of defective products that had been sold, the recalls of the 2015 RZR 1000, RZR 900 and Youth RZR, the impending recall of the 2016 RZR XP Turbo, and the risk of recalls on other similarly-designed-and-manufactured products, including other

33

model year RZR 1000s and RZR 900s and RANGER products, and the reputational harm, reduced demand, and increased expenses that had resulted from those conditions. The warning in Polaris' 10-K FY 2014 that was incorporated into the 10-Q 3Q 2015 continued to be misleading and ineffective for the reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent when Polaris had already suffered recall-related financial and reputational harm that had negatively impacted its business beyond what had been disclosed to investors, omitted to disclose the defects or describe the fire-related incidents that had occurred, and falsely assured investors that Polaris had an adequate quality control procedures in place.

**F.**      **The Individual Defendants Cause Polaris To Announce a Small Recall of the RZR XP Turbo and a Big Reduction in Its Guidance, Which It Blames on Other Circumstances**

90.     On December 10, 2015 – less than six months after launching its flagship 2016 RZR XP Turbo – Polaris recalled 2,230 of the vehicles due to a fire hazard. Polaris and the CPSC explained that the recall was necessary because the XP Turbo's engine could overheat and the turbo system's drain tube could loosen, posing a fire hazard. Prior to the recall, Polaris had received two reports of RZR XP Turbos with oil leaks and two reports of the vehicles catching on fire.

91.     On December 17, 2015, the Individual Defendants caused Polaris to decrease its fiscal year 2015 ("FY 2015") full-year sales and earnings guidance by more than half, lowering its sales growth projections to a range of 4%-5% and cutting its earnings growth projection to 1%-2% versus its prior guidance of 11%-12%. The reduction was attributed to weaker than expected North American ORV sales, and the Individual Defendants caused the Company to claim that it had reduced shipments of high margin side-by-side ORVs to reduce dealer inventory levels. However, the Individual Defendants again caused the Company to conceal the impact that the recall had on Polaris' declining sales or reduced guidance, or on the continued high levels of inventory at its dealers.

G.      **Fourth quarter fiscal 2015 ("4Q 2015") and fiscal year 2015 ("FY 2015")
        Earnings Release and Annual Report**

92.     On January 26, 2016, the Individual Defendants caused Polaris to issue a press release announcing its financial results for 4Q 2015 and FY 2015, for the period ending December 31, 2015.

93.     The FY 2015 earnings release reported net income of $110.7 million ($1.66/share) for the quarter and $455.4 million ($6.75/share) for FY 2015, which was in line with the Company's recently reduced guidance. The earnings release then provided the following guidance for fiscal year 2016 ("FY 2016"):

**2016 Business Outlook**

Given the anticipated ongoing weak industry trends in North America, particularly in the oil and gas regions and continued volatility in the currency markets, the Company expects full year 2016 net income to be in the range of $6.20 to $6.80 per diluted share, compared to the $6.75 per diluted share reported in 2015. Full year 2016 sales are anticipated to be in the range of down two percent to up three percent over full year 2015 sales. Ongoing currency volatility and industry retail sales uncertainty are the major reasons for the wider guidance range for sales and earnings per share for 2016.

94.     Later the same day, the Individual Defendants caused Polaris to hold a conference call to discuss its FY 2015 results with investors and analysts. Defendants Wine, Morgan, Pucel, and Speetzen each participated on the call, as did other Polaris officers. As detailed below, on Polaris' FY 2015 earnings call on January 26, 2016, Defendant Morgan, (who would suddenly "retire" in May 2016), stated that the financial effects of the RZR recalls in October 2015 were all in the past.   None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein.

95.     Specifically, during his opening remarks on the earnings call, Defendant Wine admitted that the Company had lost share in the side-by-side ORV market, but pinned the loss on weather and macroeconomic conditions, and assured investors the loss was not significant or due to Company-specific problems:

[WINE:] We cited broad-based demand weakness when we dramatically cut shipments and revised our guidance in mid-December and saw only modest improvement in the final weeks of the year. Overall, Polaris retail sales were down mid-single digits for the quarter, as poor snow conditions and continued region-specific weakness resulted in slow dealer traffic. Despite solid demand for the new GENERAL and improving interest in the RZR Turbo, we experienced a slight side-by-side market share loss in the fourth quarter, hurting our pride more than our P&L.

\*       \*       \*

[WINE:] Well, I think what we said is overall in powersports, including all aspects, we expect to gain share. ORV's going to be extremely competitive. We know that. We've factored that in. We saw it in the fourth quarter and we're modeling that we're going to hold share.

96.     In addition, in response to a follow up question from an analyst, Wine and Morgan admitted that the October RZR recall had hurt sales and contributed to the lost market share, but claimed that was a unique, one-time event that had not factored into the weak FY 2016 guidance and did not present risks going forward:

[ANALYST:] Question is on the side-by-side share. So you guys lost some share in the 4Q in side-by-sides and that's the first time we've seen that, that I can remember. Is this mostly coming from the more performance side, RZR, or is this on the Ranger side? And what has changed? What was causing the market share losses specifically in 4Q? Because I think from your guidance it implies that you guys are – that that's no longer going to be the case and you'll hold onto share. Is there something unique in the quarter?

[WINE:] Trey, Bill could provide really good color on this. But as we talk about share in side-by-side, let's make sure we're grounded in where our position is. You realize that we are three times combined the share of the next three players. So we're coming from a pretty good position. And the amount of share loss that we're talking about, I don't want to call miniscule, immaterial, I mean not a very large amount. So we're not going to overreact, although we are very focused on maintaining and gaining share. But let's not – we are not panicked over that and we feel very good about how we'll deal with it going forward.

[MORGAN:] Let me just add on. Again, I think you get sometimes in quarters, as Scott's alluding to, there can be a little bit of timing. What was unique in the fourth quarter I think are a couple elements. As everybody well knows, there was a number of new competitive introductions that frankly started shipping and had probably some initial pent-up retail sales that we saw in the fourth quarter for the first time

36

coming off of zero comparables. The industry was weak. So the industry was less able frankly to handle that.

The other thing we had is we had a recall due to some quality issues with vent lines on our RZR product in October, and October was our weakest performing month of the quarter. We think that had some impact as well. And that's shame on us. But we seem to have powered through that as we go forward. Then again, the other thing I said in my remarks is we were coming off some really sporty comparables in the fourth quarter where we were up double digits percent, which again I don't think we see frankly in the '16 model. We don't have those kind of comps that we're going up against.

So I do think there is some unique aspects about the fourth quarter. But as Scott said, it will be a competitive environment and we're going to have to be at our very best.  And we're going to have to be better than we were in '15 if we're going to hold and ultimately do what we expect to do, which is gain some share.

97.     The foregoing statements were materially false and misleading because the product defects and manufacturing practices that had led to the October recall had not been corrected, affected more vehicles and more model years than had been disclosed, had resulted in significantly increased warranty and legal expenses which were likely to continue, presented significant and undisclosed risks to FY 2016 sales and earnings. By blaming FY 2015 results and reduced FY 2016 expectations on other, primarily non-Company-specific, circumstances, and downplaying the market share loss in the side-by-side vehicle segment, the foregoing statements concealed the true nature and magnitude of the risks to the Company from the product defects and recalls, and the reduced consumer confidence, higher warranty and legal expenses, increased recall risks, and other negative conditions that had resulted from those circumstances. Polaris' FY 2016 guidance added to the misleading import of the other contemporaneous statements alleged herein, and was misleading in its own right, because it failed to factor in or apprise investors of the risk of reduced sales and earnings and higher costs that were reasonably expected to result from the recall, repair or reduced demand caused by those defects and the reputational harm they had already caused to Polaris' brand and reputation.

98.     On February 19, 2016, the Individual Defendants caused Polaris to file its Annual Report on Form 10-K for FY 2015 (the "10-K FY 2015") with the SEC. Defendants Wine and Sweetzen signed the 10-K FY 2015, as well as signed SOX certifications filed with the 10-K FY 2015.  Wine signed the 10-K FY 2015 as attorney in fact on behalf of Defendants Clayton, Farr, Hendrickson, Henricks, Kessler, and Wiehoff. The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been re-evaluated to take into account changes in manufacturing quality, product recalls and other factors. The report disclosed that the Company had a warranty reserve balance of $56.5 million as of the end of FY 2015.

99.     The warranty reserve disclosures were materially false and misleading because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual in light of the July and October recalls of the MY2015 Youth RZR, RZR 1000 and RZR 900 products and the MY2016 RZR XP Turbo product, or the reasonably expected warranty expenses arising from claims, repairs and recalls of other Polaris products affected by the same or similar design and manufacturing defects, including the 2013 through 2016 RZR 900s and RZR 1000s and additional 2016 RZR Turbo products.

100.    The 10-K FY 2015 provided substantially the same warning with respect to product recalls and defects that had been provided in the 10-K FY 2014:

> Significant product repair and/or replacement due to product warranty claims or product recalls could have a material adverse impact on our results of operations.
>
> We provide a limited warranty for ORVs for a period of six months, for a period of one year for our snowmobiles, for a period of one or two years for our motorcycles depending on brand and model year, and for a two year period for GEM, Goupil and Aixam vehicles. We may provide longer warranties related to certain promotional programs, as well as longer warranties in certain geographical markets as determined by local regulations and market conditions. We also provide a limited emission warranty for certain emission-related parts in our ORVs, snowmobiles, and motorcycles as required by the EPA and CARB. Although we employ quality control procedures, sometimes a product is distributed that needs repair or replacement. Our standard warranties require us or our dealers to repair or replace defective products during such warranty periods at no cost to the consumer.

Historically, product recalls have been administered through our dealers and distributors. The repair and replacement costs we could incur in connection with a recall could adversely affect our business. In addition, product recalls could harm our reputation and cause us to lose customers, particularly if recalls cause consumers to question the safety or reliability of our products.

101.    By using substantially the same risk warning in the FY 2015 report that it had used in its FY 2014 report, the Individual Defendants were causing Polaris to tell investors that there had been no material changes in or additions to Polaris' recall-related risks during FY 2015, which was not true. The warning that Polaris' operating results could suffer if products had to be recalled was both misleading and ineffective, because it portrayed that risk as uncertain and contingent while omitting to disclose that Polaris' business and reputation had already been materially affected by the recalls, and had and would continue to result in increased warranty and product liability expenses, decreased sales and demand for Polaris products, as a result of recalls that had already been announced and as the result of existing defects in and ongoing claims on products that had not yet been formally recalled, including defects in the MY2013 through 2016 RZR 900s and RZR 1000s. Like the FY 2014 warning, the FY 2015 risk warning was also misleading because it failed to disclose the deficiencies in Polaris' "quality control procedures," including that products were often rushed to market without sufficient testing and/or with parts that had not passed the Company's own quality-control standards.

**H.    April 19, 2016 Recall Announcement**

102.    On April 19, 2016, the Individual Defendants caused Polaris to issue a press release announcing that all RZR 900 and 1000 vehicles from model year 2013 forward would be recalled due to the risk of fires from defects in the products. Approximately 160,000 vehicles, including vehicles outside the U.S., were subject to the recall, which was also announced by the CPSC the same day.   The CPSC notice indicated that the recall was due to the risk that the vehicles may catch fire while consumers are driving, posing fire and burn hazards to drivers and passengers. The CPSC notice further indicated that, prior to the recall, Polaris had received *more than 160 reports*

of RZR fires, resulting in one death of a 15-year-old passenger from a rollover that resulted in a fire and 19 reports of injuries, including first, second and third degree burns.

103.    In the Company's April 19, 2016 press release, the Individual Defendants caused Polaris to feature the Company's purported safety record and falsely assured consumers and investors that a "thorough investigation" had "pinpoint[ed] the root cause" of the fires affecting the products, and the company had identified a "comprehensive solution" to address the problems:

> Polaris Industries jointly announced with the U.S. Consumer Product Safety Commission, today, that the company is voluntarily recalling certain RZR 900 and 1000 off-road vehicles manufactured since model year 2013 due to reports of thermal-related incidents, including fires. Detailed information about the recall is available at www.polaris.com/rzr-recall.

> Polaris conducted a thorough investigation to pinpoint the root causes and put forward a comprehensive solution to address them.

> "One of our foremost guiding principles is Safety and Ethics Always," said Scott W. Wine, Chairman and CEO, Polaris. "We know that the foundation of a good ride is a safe ride, and we have been proactive, aggressive and thorough in putting forth a plan to get our vehicles repaired and give us – and our customers – confidence in the safety of our RZR vehicles."

> All affected vehicle owners will be asked to contact a dealer to schedule a complimentary service appointment, which should take approximately one hour. Polaris is working quickly to source the necessary parts – and is allocating parts daily to dealers as they become available. Dealers will schedule appointments subject to parts availability.

> "We are working day and night to inform our customers and dealers and to obtain the parts needed for the repairs we identified in our comprehensive analysis," said Wine. "We apologize for the inconvenience to our customers as we work to ensure all the systemic thermal risks we identified are eliminated from our vehicles."

> Polaris has already begun implementation of its Corrective Action Plan and has made manufacturing updates in new-production vehicles. Polaris also plans to include a warning on new-production vehicles instructing riders not to carry fuel and other flammable liquids in their vehicles, and cautions against carrying flammable liquids in previously produced models.

104.    The recall press release the Individual Defendants caused Polaris to issue was materially false and misleading to investors because, upon information and belief, the Individual Defendants had not caused the Company to conduct a thorough investigation of the problems affecting the recalled products, but rather had rushed the products to market to meet competitive pressures.  The Individual Defendants' conduct caused risk of injuries to customers and adverse financial consequences to the Company.

## I.    First Quarter Fiscal 2016 ("1Q 2016") Earnings Release and Quarterly Report

105.    On April 21, 2016, two days after the recall was announced, the Individual Defendants caused Polaris to issue a press release to announce its financial results for the first fiscal quarter of 2016, the period ended March 31, 2016 ("1Q 2016"). The press release reported net income for the quarter of $46.9 million ($0.71/share), and said the Company had incurred "expenses totaling approximately $30 million related to certain product liability settlements, ORV related warranty accruals, severance costs and acquisition related costs."

106.    In the press release, Defendant Wine assured investors that the product recall had not impacted the Company's sales or earnings. Wine bolstered those assertions by reaffirming FY 2016 earnings guidance, while suggesting that the Company was being conservative in doing so, and there was significant upside to the forecast.  Wine was quoted in the release as stating, in part, that:

> "Our first quarter results were in line with our projections, in spite of increased expenses for warranty and product liability. Our Customer Excellence initiatives and new products drove a six percent increase in North American retail, and in conjunction with shipment reductions, better demand forecasting, and process control improvements, enabled us to continue reducing dealer inventory levels year-over-year. During the quarter, we improved shipment lead-times, met retail demand from our Spirit Lake motorcycle facility, and completing the acquisition of Taylor-Dunn. I still believe 2016 is likely to be another volatile year in powersports, but we are seeing pockets of strength. The North American ORV industry was up in the first quarter, with March experiencing the strongest improvement," commented Scott Wine, Polaris' Chairman and Chief Executive Officer.

41

"We remain focused on an all-out assault on costs and rededicating the business to drive growth, not only for this year but as part of a renewed commitment to achieving our 2020 objectives. The entire Polaris team is united, and determined, to grow sales and expand margins."

**2016 Business Outlook**

While the powersports industry was slightly better than anticipated in the 2016 first quarter, the Company is keeping its guidance range unchanged for the full year 2016 with earnings expected to be in the range of $6.20 to $6.80 per diluted share with sales in the range of down two percent to up three percent over 2015 due to the persistent unpredictability around overall economic trends and more specifically powersports industry trends for the remainder of 2016.

107.     The earnings announcement was materially false and misleading because it: (i) understated the risks to the Company from rising warranty and product liability expenses, and the significance of the impact of those expenses on reported and expected results, including as a result of the recent recall announcement; (ii) overstated the Company's ability to forecast demand or take advantage of the purported improvement in the ORV market, particularly in light of the recall announcements and reduced customer confidence; and (iii) provided guidance for future sales that the Company had no reasonable expectation of meeting in light of the increased warranty and product liability expenses and reduced demand for its RZR side-by-side ORVs and other defective products.

108.     Also on April 21, 2016, the Individual Defendants caused Polaris to host its earnings call to discuss its 1Q 2016 results of operations with investors and analysts. Defendants Wine, Morgan, Pucel and Speetzen each participated on the call, as did other Polaris officers. None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein.

109.     During the April 21, 2016 conference call, Defendants once again assured investors that the thermal issues had been resolved after a careful and "extensive investigation." In his opening remarks on the call, Defendant Wine asserted:

This week, we announced a major recall of more than 160,000 RZR vehicles to address fire and other thermal risks in our global RZR business. The recall was

the culmination of an extensive investigation that ultimately isolated several disparate and difficult to discern root causes.

We spared no resource or cost and worked closely with Consumer Product Safety Commission to ensure that we had identified and addressed all of the systematic root causes of these thermal issues. We regret the inconvenience this recall has on our customers, but the safety of our products and our riders must always take precedent. Our final guiding principle is customer loyalty, and it is earned not only by the performance and features of our vehicles, but also by our performance when our customers need us.

Over the past eight years, our industry-leading RZRs have garnered amazing customer loyalty, and we are committed to delivering the part support and experience through this recall to maintain that. Polaris customers expect us to build products that are fun and safe to operate, and we're taking this necessary step toward that goal.

110.     During the conference call, analyst Michael Core requested "a little more color on ... the genesis of all of these quality issues": ("Is it just the complexity of the product you're building? Is it some of the capacity tightness that you've experienced?").  Defendant Wine again assured investors that a thorough investigation had been conducted, the Company understood the root causes and magnitude of the problems and how to fix them, and they were not the result of any systemic or fundamental problems that presented extraordinary risks to the business:

The RZR recall specifically is a little bit different beast than we've had in the past. Instead of going after one specific issue, we've literally looked at the entire system of the vehicle and tried to determine if there's anything in there that could cause a thermal risk and then going after it.

So this is a different way of looking at it than we have in the past, and I think we'll be a better Company for it. But I don't think it's – because of a bit of an apples and oranges comparison to how we've done things historically, it's not really right to look and say it's dramatically worse than we've ever been.

We are taking this seriously. We are learning from it. I'm extremely confident in what Ken's driving in the manufacturing and quality initiatives. This is an extremely unfortunate event and we are in the process of getting better. But I wouldn't read into it that there's a systematic fundamental problem other than what we've been talking about for a long time of trying to get the fundamentals right of building a lean enterprise to be able to build in quality, reduce rework, reduce warranty consistently over time.

43

111.    In addition, during the April 2016 conference call, analyst Trey Grooms asked for more details on the mechanics of the recall and the cost and timing of the repairs.  Defendant Wine and Morgan responded as follows:

> [WINE:] Yes, Trey, obviously this recall is of paramount importance to us, because we want to take care of our customers and as Bennett said in his remarks, our first priority is to get our customers that own RZR back to riding as quickly as we possibly can. We will start shipping the kits out on the 22nd, and be repairing vehicles in dealerships very, very rapidly from there on out. As Ken said, in his remarks, or Bennett, we expect to do this all the second quarter, and we are going to take every opportunity to expedite parts as quickly as we can. We're cutting them into production simultaneously with the shipment of the parts, so we will be able to get good products to our dealers. It ultimately works through what's on the floor in our dealerships, get those repaired, but the first priority is to get those customers that have vehicles back to riding as quickly as possible. We're not going to give the specific cost, but we covered a good bit of it in the first quarter, and then the rest of it is included in our guidance.

> [MORGAN:] Yes, so Trey, we obviously booked it against cost-of-goods sold from a warranty standpoint. It's about a 120 basis point drag on gross margins in the quarter. And as Scott indicated, we don't want to get into a lot of detail, because obviously, the recall is complex and different for each RZR model, so the cost per unit is going to vary quite a bit based on that.

112.    To further reassure investors that the recall would not have a significant impact on Polaris' sales or market share, Defendant Speetzen said on the 1Q 2016 call that the Company's FY 2016 guidance remained intact:

> [T]here were some unanticipated costs in the first quarter related to product liability and warranty. While these items were not contemplated in our previously issued guidance, we were able to cover these additional costs in the first quarter and report earnings in line with our previous expectations.

113.    Defendant Wine then responded to an analyst's question about recall cost per recalled RZR by asserting that the financial impact was built into 2016 guidance, which remained unchanged from the 1Q 2016 call: "We're not going to give the specific cost, but we covered a good bit of it in the first quarter, and then the rest of it is included in our guidance."

114.    The foregoing statements on Polaris' 1Q 2016 earnings call were materially false and misleading to investors because: (i) they overstated the extent of the Company's investigation

44

into, understanding of, and ability to address the problems arising from the RZR recalls, and understated the costs and expenses of doing so; (ii) misrepresented the nature, source and extent of the problems, including by falsely stating that they were not the result of systemic or fundamental problems in Polaris' operations, as defendants later admitted was, in fact, the case; (iii) misrepresented that the repairs could or would be completed "very, very rapidly" and finished by the end of the second quarter, and omitting the risks to doing so; and(iv) omitted to disclose the extent to which the repeated recall announcements had harmed Polaris' reputation, reduced customer loyalty, and reduced demand for its products.

115.    The 1Q 2016 guidance that the Individual Defendants caused Polaris to issue was materially false and misleading, because it failed to factor in or apprise investors of the risk of reduced sales and earnings and higher costs that were reasonably expected to result from the recall, repair or reduced demand caused by those defects and the reputational harm they had already caused to Polaris' brand and reputation. Instead of accounting for the significant harm to Polaris' reputation and the increased costs that were anticipated from the just-announced recall, the guidance, together with defendants' explanations as to how it had been set, falsely suggested to investors that the Company was being cautious in not raising guidance, and there were reasons to believe that performance could be even better than projected by the guidance. This was not true, and there was no reasonable basis to believe that it was. In addition, as with the prior guidance issued during the Relevant Period, the 1Q 2016 guidance contributed to the false and misleading nature of the other contemporaneous statements alleged herein, because it further assured investors that the recalls did not present significant or unusual risks to the Company's business or financial condition, and that Polaris had identified and was addressing all of the recall-related risks.

116.    On April 29, 2016, the Individual Defendants caused Polaris to file its first quarter 2015 (the "1Q 2016") report on Form 10-Q with the SEC (the "10-Q 1Q 2016").  Defendants Wine and Speetzen signed the 10-Q 1Q 2016, as well as the SOX certifications filed therewith.  The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been

re-evaluated to take into account changes in manufacturing quality, product recalls and other factors. The report disclosed that the Company had a warranty reserve balance of $67.2 million as of 1Q 2016.

117.    The warranty reserve disclosures were materially false and misleading because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual in light of the prior recalls, including the just-announced recall of the 2013 through 2016 RZR 1000 and RZR 900 products, or the reasonably expected warranty expenses arising from claims, repairs and additional recalls of 2016 RZR XP Turbo products that had not and could not be repaired, as well expenses and potential recalls of other Polaris products affected by the same or similar design and manufacturing defects.

118.    The 10-Q 1Q 2016 included the following statement:

ITEM 1A – RISK FACTORS

There have been no material changes or additions to our risk factors discussed in our fiscal 2015 Annual Report filed on Form 10-K. Please consider the factors discussed in "Part I, Item 1A. Risk Factors" in such report, which could materially affect the Company's business, financial condition, or future results.

119.    The assertion that there had been no material changes in or additions to Polaris' risk factors was misleading and ineffective because the risks of product recalls had materially increased and already manifested due to continued incidents of fires involving RZR and other products, the increasing number of defective products that had been sold, the recalls of the RZR XP Turbo, RZR 1000, RZR 900 and other products, the inability of Polaris to effectively repair the products that had already been recalled and the unavailability of parts to do so, the risk of recalls on other similarly-designed-and-manufactured products, the reputational harm that had already reduced demand for Polaris' products, and the reduced sales and increased warranty, product liability and promotional expenses that had resulted from these conditions. The warning in Polaris' 10-K FY 2015 was incorporated into the 10-Q 1Q 2016 continued to be misleading and ineffective for the

reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent when in fact Polaris had already suffered recall-related financial and reputational harm that had negatively impacted its business beyond what had been disclosed to investors, omitted to disclose the defects or describe the fire-related incidents and reputational harm that had already occurred, and falsely assured investors that Polaris had an adequate quality control procedures in place.

### J.    Second quarter fiscal 2016 ("2Q 2016") Earnings Release, Quarterly Report And RANGER ORV Recall

120.    On June 28, 2016, Polaris and the CPSC jointly announced the recall of approximately 43,000 2015 and 2016 RANGER 570 ORVs because the vehicles could overheat during heavy engine loading, slow-speed intermittent use or high outdoor temperatures and catch fire. Polaris said it had received seven reports of RANGER 570s overheating and catching on fire prior to the recall. To repair the defect, Polaris had to again replace the ineffective heat shields.

121.    On July 20, 2016, the Individual Defendants caused the Company to issue a press release announcing its financial results for 2Q 2016 (the period ended June 30, 2016). The press release reported net income of $71.2 million ($1.09/share), after "expenses totaling approximately $25 million for increased warranty, legal and other costs associated with the product recalls." The Company also lowered its FY 2016 earnings guidance by approximately 5% to a range of $6.00 to $6.30 per share, following a reported decline in ORV sales due to purported softness in the market.

122.    The 2Q 2016 earnings release quoted statements by Defendant Wine and stated, in relevant part:

Polaris Industries Inc. today reported second quarter net income of $71.2 million, or $1.09 per diluted share, for the quarter ended June 30, 2016 compared to $100.9 million, or $1.49 per diluted share reported in the second quarter of 2015. Sales for the second quarter of 2016 totaled $1,130.8 million, up one percent from last year's second quarter sales of $1,124.3 million.

"Our team's diligent and methodical execution drove a modest increase in second quarter sales despite a strong year-over-year sales comparison, a weaker retail sales environment, and product recalls. Our all-out assault on costs continued to make progress during the quarter, generating earnings that finished in-line with our updated guidance. As we move into the second half of the year, and we are

47

redoubling our commitment to providing our consumers with the safest and most reliable vehicles in the industry while building a platform to return to profitable growth," commented Scott Wine, Polaris' Chairman and Chief Executive Officer.

"I am proud of how our employees and dealers have dedicated themselves to working through the current difficult environment, from the recall announcements to weaker industry trends. Dealer inventories are in-line with expectations. Our new Huntsville, Alabama plant began producing RANGERS at the beginning of June and Slingshots in early July, and our growing lean capabilities are driving factory inventory reductions and increased cash flow, while our customer excellence initiatives are enhancing our capabilities to deliver world-class sales and service to our consumers," continued Wine.

"Commensurate with our commitment to industry-leading innovation, we have a number of model year 2017 products that will be introduced next week at our annual dealer meeting, which include vehicles that will significantly strengthen our line-up in areas where the competition has been the most intense."

\*       \*       \*

ORV wholegood sales decreased six percent to $645.4 million reflecting ongoing softness in retail sales in North American oil markets and tough comparables from the second quarter of last year. Polaris North American ORV unit retail sales were down low double-digits percent compared to the 2015 second quarter, with consumer purchases of side-by-side vehicles down high-single digits percent and ATV retail sales down mid-teens percent compared to the prior year. The North American ORV industry was down mid-single digits percent compared to the second quarter last year. ORV dealer inventory was down eight percent in the 2016 second quarter compared to the same period last year.

\*       \*       \*

**2016 Business Outlook**

For the full year 2016, the Company is revising its earnings guidance range to $6.00 to $6.30 per diluted share with sales expected in the range of down 2 percent to flat compared to 2015. Sales expectations by segment for the full year 2016 are as follows: ORV/Snowmobile sales expected down mid-single digits percent; Motorcycle sales up double-digits percent; and Global Adjacent Market sales up mid-teens percent.

123.    Also on July 20, 2016, the Individual Defendants caused Polaris to host an earnings call to discuss its 2Q 2016 results of operations with investors and analysts. Defendants Wine,

Speetzen and Pucel each participated on the call. None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein.

124.    On the July 20, 2016 earning call, Defendants Wine and Pucel again downplayed the recall by overstating Polaris' grasp of the problems underlying the recalls and its progress on addressing those problems and assuring investors of its commitment to safety:

> [WINE:] The extensive and ongoing product recalls related to fire risks on our vehicles impact every Polaris stakeholder in some way, but our primary focus is on our customers, keeping them safe, completing their safety bulletins so they can ride and rebuilding their trust and confidence in Polaris. As we work aggressively to accomplish these goals, we have become much smarter about the thermal risks across our product lines, which drove additional recalls in the second quarter.

> We have discovered gaps in our design, development and manufacturing processes, and are urgently addressing these gaps, while also working to improve our post sales surveillance process to increase our speed of response when issues occur. We have more work to do and we'll move forward with urgency to continue to mitigate safety issues for our customers.

> *       *       *

> [PUCEL:] [W]e did an internal diagnostic on the root causes of the recalls. And we traced them back to the quality system elements and the design control elements, and we're putting systemic fixes in place to address those. We're also increasing our spend and our investment in safety and design capabilities in those areas. So you're going to see some systemic fixes that come across our engineering capabilities as a result of that.

125.    Defendants Wine and Speetzen told investors that the Company had incurred $25 million in recall related costs in 2Q 2016, and was lowering its FY16 earnings guidance to a range of $6.00-$6.30 per share, a reduction of $0.35/share at the midpoint from its prior guidance range. Defendants Wine and Speetzen each told investors that Polaris had now factored in all "probable and estimatable" recall-related costs into the reduced guidance:

> [ANALYST:] Could you maybe talk about the recall, you did indicated that you've gone through a process of identifying future items, and I think there was a recall for – on the RANGERS side. Maybe just quantify the size of what you are looking for and whether you think that the majority of the recall charges and issues are behind you right now?

49

> [WINE:] [I]f you listened to my accounting speak during my prepared remarks, I did say that we had all of our probable and estimatable costs included in the guidance that we just issued over the second-quarter results. I will tell you that the work that Ken and his team are doing to go through our products and ensure that there's not fire risk in our vehicle, it's a massive project. I don't think it's – as I said in my remarks, there is still more work to do.  But we don't foresee things that are drastically different from what's been included in our results in our forward-looking guidance.

*     *     *

> [SPEETZEN:] I'm not going to get into a lot of details behind the cost for obvious reason. But I think, Scott's point around saying they're probable and estimatable is that we've included everything in what we've reported so far in terms of forward guidance other than any promotional activity that we are required to reserve for given the shipments we've made, now that we think we'd have to do in terms of simulating demand.  There would not be any additional cost that we would have built in in the forward guidance.

126.    On the same call, Defendant Wine also steered concern away from the recalls' impact on sales and slumping market share, explaining that market share loss was not a result of the recall, but rather from the Company's less competitive non-RZR and RANGER products:

> I would say that most of the share loss was not related to the recall. It was very, very inconvenient, but I don't know that, specifically around RZR, that people bought competitive products during that period of time. We got after it pretty quickly so we could have product in the dealerships. The bigger issue was on value ATVs and the utility side of the business and I'm encouraged and comfortable with the plan that Matt has, as I've said a couple of times.

*     *     *

> I think it's more related to our product line-up than anything else. I mean we put ourselves at a product disadvantage, and as I've said, it's more in the value ATV segment and the utility segment, that was difficult to defend it. It drove our promotion costs higher as we try to compete with not our best products. . . .

127.    During the July 20, 2016 conference call, Defendant Speetzen said that the guidance reduction reflected the increased warranty and recall-related expenses in the quarter, but blamed lowered sales results and projects primarily on a purportedly weak market:

> This morning, I will provide a brief update on each of our segments and review our updated guidance for the remainder of 2016. First, as Scott mentioned,

50

during the quarter we booked additional costs related to warranty and other recall-related expenses totaling approximately $25 million.

We're working aggressively to offset these expenses with additional cost-down efforts, as well as benefits from favorable currencies. However, given these costs, as well as a weaker industry environment, we are revising the lower end of our EPS range to $6 and lowering the upper end of the EPS range to $6.30 for the full year 2016.

\*       \*       \*

On a segment reporting basis, sales expectations are revised as follows. ORV and snowmobile sales are expected to be down mid-single- digits versus previous guidance of sales down low to mid-single-digits. Motorcycle sales are anticipated to be up double-digits percent versus previous guidance of sales up high teens.  And global adjacent markets sales are expected to be up mid-teens percent.

Now let me provide more details around our segments, starting with ORV and snowmobiles. ORV and snowmobiles segment sales were down 6% in Q2, driven primarily by weak industry trends and the impact from product recalls during the quarter.

Sales were also negatively impacted by currency as well as a higher promotional spend environment as we fought a tough competitive environment. For the full-year 2016, our ORV and snowmobiles segment sales are expected to be down mid-single-digits percent, which implies second half sales will be down in the low single-digit range.

\*       \*       \*

Moving on to gross margins. Gross margin were down 325 basis points, reflecting additional warranty as well as continued pressure from foreign exchange. I'd also point out that the warranty costs incurred in Q2 reflect ongoing quality and safety issues, including a higher assumed completion rate for the RZR 900 and 1000 recalls and associated cost to attain that higher completion rate.  We are maintaining our full-year 2016 gross margin guidance to be down 70 to 120 basis points. This assumes foreign exchange will be an approximate 80-basis point headwind for the full year.

On a constant currency basis, gross margins would be up 10 basis points to down 40 basis points. Our full-year gross margin guidance not only includes the additional warranty costs mentioned earlier, but also reflects stronger than originally anticipated savings from our cost-down VIP initiatives.

\*       \*       \*

51

Finally, given the one-time events that have occurred this year, as well as a weaker industry than expected, I'd like to make a few comments around our expectations for Q3. Given weaker industry trends and continued foreign exchange headwinds, we're expecting sales growth for our ORV and snowmobile segments in the third quarter to be down low double-digits over the prior year.

128.    Defendants did not disclose on the 2Q 2016 call that Polaris was going to issue a stop-ride/stop-sell for the RZR Turbo within a week due to fire-related defects.

129.    The foregoing statements issued in July 2016 were materially false and misleading because: (i) there was no basis for the assertion that Polaris' reduced guidance included all "probable and estimable" recall-related expenses, as reflected in part by the amount and nature of the costs that were required to address the problems, all of which were apparent and foreseeable at the time of the 2Q 2015 statements; (ii) the reported recall-related expenses of $25 million did not fairly or accurately reflect the actual or anticipated cost of addressing the fire-related recall issues, as characterized on the call; (iii) the statements omitted to disclose that Polaris was then finalizing a recall of the RZR Turbo with the CPSC or fairly and accurately disclose the actual and potential costs associated with that recall; (iv) defendants continued to overstate the extent of the Company's investigation into, understanding of, and ability to address the problems arising from the RZR recalls; (v) the statements misrepresented the causes of lost market share and lower sales and demand by attributing them to macro- economic conditions or competitive product introductions, and falsely asserting that any recall-related impacts were negligible and had been corrected; and (vi) misrepresenting and understating the harm to Polaris' reputation that had been caused by the recall, leading to reduced customer loyalty, and reduced demand for its products.

130.    The 2Q 2016 guidance that the Individual Defendants caused Polaris to issue was materially false and misleading because it failed to factor in or apprise investors of the risk of reduced sales and earnings and higher costs that were reasonably expected to result from the recall, repair or reduced demand caused by those defects and the reputational harm they had already caused to Polaris' brand and reputation. Instead of accounting for the significant harm to Polaris' reputation and the increased costs that were anticipated from the just-announced recall, the

guidance update provided in the 2Q 2016 earnings release, and Defendants' explanation as to how it had been set, was materially false and misleading because they continued to falsely indicate to investors that the Company's forecast was not at increased risk.  This was not true, and there was no reasonable basis to believe that it was, given the significant costs that had been incurred as a result of the April recall, the stop-ride/stop-sale announcement on Polaris' hottest product, the RZR XP Turbo, and the Company's continuing inability to find a solution to or repair the product defects, and the significant harm that had been caused to Polaris' brand and reputation. In addition, as with the prior guidance issued during the Relevant Period, the 2Q 2016 guidance contributed to the false and misleading nature of the other contemporaneous statements alleged herein, because the recalls did not present significant or unusual risks to the Company's business or financial condition, and that Polaris had identified and was addressing all of the recall-related risks.

131.    On July 22, 2016, the Individual Defendants caused Polaris to file its Report on Form 10-Q with the SEC for 2Q 2016 (the "10-Q 2Q 2016").  Defendants Wine and Speetzen signed the 10-Q 2Q 2016, as well as the SOX certifications filed therewith.  The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been re-evaluated to take into account changes in manufacturing quality, product recalls and other factors. The report disclosed that the Company had a warranty reserve balance of $76.9 million as of 2Q 2016.

132.    The warranty reserve disclosures were materially false and misleading because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual in light of the prior recalls, or the reasonably expected warranty expenses arising from claims, repairs and additional recalls of 2016 RZR XP Turbo products that had not and could not be repaired, as well expenses and potential recalls of other Polaris products affected by the same or similar design and manufacturing defects.

133.    The 10-Q 2Q 2016 included the following statement:

ITEM 1A – RISK FACTORS

53

> There have been no material changes or additions to our risk factors discussed in our fiscal 2015 Annual Report filed on Form 10-K. Please consider the factors discussed in "Part I, Item 1A. Risk Factors" in such report, which could materially affect the Company's business, financial condition, or future results.

134.    The assertion that there had been no material changes in or additions to Polaris' risk factors was misleading and ineffective because the risks of product recalls had materially increased and already manifested due to continued incidents of fires involving RZR and other products, the increasing number of defective products that had been sold, the recalls of the RZR XP Turbo, RZR 1000, RZR 900 and other products, the inability of Polaris to effectively repair the products that had already been recalled and the unavailability of parts to do so, the risk of recalls on other similarly-designed-and-manufactured products, the reputational harm that had already reduced demand for Polaris' products, and the reduced sales and increased warranty, product liability and promotional expenses that had resulted from these conditions. The warning in Polaris' 10-K FY 2015 incorporated into the 10-Q 2Q 2016 was misleading and ineffective for the reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent when in fact Polaris had already suffered recall-related financial and reputational harm that had negatively impacted its business beyond what had been disclosed to investors, omitted to disclose the defects or describe the fire-related incidents and reputational harm that had already occurred, and falsely assured investors that Polaris had adequate quality control procedures in place.

### K.    The July 2016 Stop-Ride/Stop-Sale Advisory and 2016 Analyst Day and Dealer Show

135.    On July 24, 2016, the Individual Defendants caused the Company to issue a press release which stated:

> Polaris Industries is issuing a stop-ride/stop-sale advisory, pending a formal recall, for MY2016 RZR Turbo off-road vehicles, due to a potential fire hazard.

> Polaris is currently evaluating a comprehensive repair solution. Once validated, repair instructions will be issued to Polaris dealers and vehicle owners will be notified that they can contact their dealer about scheduling a free repair. Until then, owners should not ride, and dealers should not sell, MY2016 RZR Turbo models.

All owners of affected vehicles are being contacted directly. In addition, updates will be posted on the RZR Recall page: http://www.polaris.com/en-us/company/rzr-recall.

Owners can also contact Polaris at 800-765-2747 or online at www.polaris.com.

136.    Upon information and belief, on July 25, 2016, Defendants Wine, Speetzen and Pucel, along with ORV President Homan and other members of Polaris' management were in Nashville, Tennessee for the Company's annual 2016 Analyst & Investor Meeting and dealer show on July 25, 2016 ("July 2016 Dealer Show"), at which its new ORV products were rolled out. The Individual Defendants continued their false and misleading statements at the July 2016 Dealer Show, where they continued to assure investors that they had addressed the issues leading to the RZR recalls.

### L.    The Individual Defendants Cause Polaris to Recall the XP Turbo

137.    On September 1, 2016, the Individual Defendants caused Polaris to announce the "formal recall" of the 2016 RZR XP Turbo that was subject to its earlier stop-ride/stop-sale advisory. The recall affected 13,000 vehicles.  Prior to the recall, Polaris received 19 reports of XP Turbos catching on fire, with six resulting in burn injuries. One of the reported fires was in Utah's American Fork Canyon that burned a young child and caused a forest fire.  The recall notice stated, in part:

> The engine control unit may allow the engine to continue to run in an extreme overheat condition, which could result in damage to the head or head gasket, which in turn may allow a release of coolant or engine oil. In addition, the fasteners used to attach the oil drain tube to the turbo system may have been assembled by the supplier with inadequate torque or subsequently become inadequately torqued, allowing a release of engine oil. The release of engine oil or coolant onto hot surfaces can create a fire hazard.

### M.    The Individual Defendants Finally Cause Polaris To Admit the Significant Impact of the Fire Defects on Its Sales and Financial Condition

138.    On September 12, 2016, the Individual Defendants caused Polaris to reduce its 2016 guidance by 43% – to $3.30 to $3.80 per share – because "thermal-related issues" in the RZR

model were severely affecting sales. Despite Defendants' earlier assurances, the Company admitted in a press release that it did not have a solution for the problems causing the RZR fires, and that the repeated recalls had damaged Polaris' brand and reputation and resulted in significantly reduced sales and earnings:

> The Company now expects full-year 2016 earnings to be in the range of $3.30 to $3.80 per diluted share, $2.50 to $2.70 per diluted share lower than previously expected of which approximately two-thirds is expected to be incurred in the third quarter. Polaris also expects total Company sales for the full-year 2016 to be down in the mid to high-single digit percent range compared to previously issued guidance of flat to down two percent.

> Since Polaris last updated its full year guidance and hosted its investor day in July, the Company has experienced additional RZR thermal-related issues and was unable to sufficiently validate the initially identified RZR Turbo recall repair, necessitating a more complex and expensive repair solution. As a result, the voluntary stop ride/stop sale notification issued on July 25, 2016 remained in place significantly longer than originally anticipated, delaying any sales of the highly-requested RZR Turbo vehicle. Also, given the additional RZR thermal issues, the Company revalidated many of its recently introduced model year 2017 ORV products, causing a delay in shipments of those vehicles. The Company believes its model year 2017 products and the more aggressive programs it has planned for the second half of 2016 will have a positive impact on Off-Road Vehicle ('ORV') sales. However, given the delayed model year 2017 shipments and additional recall activity, the expected positive impact will be deferred later than the Company had originally estimated.

> The earnings revision of $2.50 to $2.70 per diluted share can be summarized as follows: approximately half is related to the margin impact from delayed model year 2017 shipments, including the high margin RZR Turbo vehicles, as the Company revalidated its new model line-up and protects dealer inventory levels, along with correspondingly lower sales of the Company's high-margin Parts, Garments and Accessories ('PG&A') business; and about 25 percent is the result of higher promotional and customer appreciation costs to rebuild confidence and credibility with RZR owners. The remaining 25 percent is primarily related to expediting the product recall repairs, including the recently announced RZR Turbo recall which, when combined with the one-time warranty, legal and acquisition related costs recorded in the first half of 2016, totals approximately $120 million, or about $1.20 per diluted share of costs that should be considered non-recurring in 2017.

> "Our number one priority is to get our loyal owners back to riding safely," stated Scott Wine, Polaris' Chairman and Chief Executive Officer. "We share the

56

frustration of our customers and dealers and we are working diligently to expedite the completion of the recall repairs and significantly improve the quality and safety of our products. We are providing increased support to our dealers and RZR owners so they can complete the necessary repairs with minimal disruption. We have engaged outside engineering experts to help accelerate the remediation process, we are sending additional repair technicians into the field to assist our dealers, and we have created a new independent safety and quality function reporting directly to me. Additionally, we are pleased that the vast majority of our model year 2017 products have begun shipping, after undergoing a thorough internal and external review to identify and address any potential safety risks. While we are disappointed with our recent performance, our team is aggressively driving improvements that will make Polaris a better and stronger company."

139.    On October 25, 2016, the Individual Defendants caused Polaris to file its press release for 3Q 2016 earnings, stating in part:

Polaris Industries Inc. (NYSE:PII) today reported third quarter net income of $32.3 million, or $0.50 per diluted share, for the quarter ended September 30, 2016 compared to $155.2 million, or $2.30 per diluted share reported in the third quarter of 2015. Sales for the third quarter of 2016 totaled $1,185.1 million, down 19 percent from last year's third quarter sales of $1,456.0 million.

"Our third quarter results, while discouraging, were in line with our revised guidance and reflect our ongoing execution of the RZR® recalls and significant quality and safety improvement initiatives. During the past three months, we have accelerated our efforts to get our loyal owners back to riding safely, and are now over 50 percent complete with the RZR® 900/1000 recalls and slightly below 50 percent on the more recent RZR® Turbo recall notice. In addition to these recall challenges, we continued to face a weak overall Powersports industry, but were encouraged by continued retail strength for Indian and our overall motorcycle business, and the return to growth for side-by-sides in September," commented Scott Wine, Polaris' Chairman and Chief Executive Officer.

"We remain committed to improving our fundamentals and executing our long-term strategy to be the 'Best in Powersports, Plus'. Our recent announcement to acquire Transamerican Auto Parts, a $740 million, vertically integrated multi-channel leader in the $10+ billion Jeep and truck aftermarket accessory space, is consistent with our strategy and exciting due to its growth potential. This transaction provides us an immediate leadership position in a growing market, while allowing us to accelerate growth and profitability for Polaris," continued Mr. Wine. "We are making the necessary investments, both internally and externally, to realize the true potential of our organization. Along with improvements in product safety and quality, we are using Huntsville and our go to market Retail Flow Management ("RFM") process to establish Lean as a competitive advantage, we are bringing technology to the forefront of our industry with Ride Command™,

57

and we are working to transform the customer experience, from purchase to service, to enhance profitability. This commitment to improving our execution and our overall performance will drive a steadier cadence of growth and profitability in the future."

*** 

Off-Road-Vehicle (ORV) and Snowmobile segment sales, including its respective PG&A sales, decreased 23 percent from the third quarter of 2015 to $923.4 million. Gross profit decreased 40 percent to $231.3 million, or 25.1 percent of sales, in the third quarter of 2016, compared to $388.5 million, or 32.6 percent of sales, in the third quarter of 2015 due to higher warranty costs related to recent recall activity primarily for the Company's RZR® vehicles.

ORV wholegood sales decreased 25 percent to $619.0 million reflecting the Company's decision to delay model year 2017 shipments, including the high margin RZR® Turbo vehicles, in order to revalidate its new model line-up and protect dealer inventory levels. Compared to the 2015 third quarter, Polaris North American ORV unit retail sales were down high-single digits percent, consisting of consumer purchases for side-by-side vehicles down high-single digits percent and ATV retail sales down low-double digits percent. The North American ORV industry was down lowsingle digits percent compared to the third quarter last year. ORV dealer inventory was down 16 percent in the 2016 third quarter compared to the same period last year.

140.    The Individual Defendants caused Polaris to host its 3Q 2016 earnings call on October 25, 2016, and Defendants Wine and Speetzen attended.  Defendant Wine acknowledged that the string of recalls was not over, as Polaris' historical review had revealed many more defects in its products, further demonstrating the falsity of defendants' earlier representations about the thoroughness of their review:

[T]here will be an abatement of the significant spike in recalls that we've had but by no means is it something that's going to go, dwindle down to nothing. The big ones are there. There's a couple – there's more work to be done.

The teams have done a really nice job as I said with this historical review and we know what's coming but certainly we are not done with recalls.

141.    Defendant Wine also acknowledged the severe financial impact that the recall had caused the Company:

Third-quarter sales were down 19%, to $1.18 billion as we prioritized recall

58

execution and quality validation and delay the launch of many of our model- year 2017 Off-Road Vehicles. Results were in line with our revised guidance but that does not make them any more acceptable.  We lost market share in a weak powersports industry and incurred approximately $65 million of recall and related legal costs.

The resulting lower volume and higher expenses weighed heavily on our earnings per share of $0.50, down nearly 80% from the prior-year period. Overall, North American retail sales for the third quarter were down 9%, our worst performance since 2009.

142.    In response to questioning from analysts on the call, Defendant Wine admitted (contrary to what Defendants said on the April and July earnings calls) that Polaris had expected sales of RZR and other side-by-side products to be difficult following the recall, and they were: "I will tell you that we were not at all pleased with how July and August went for side-by-side in general, but RZR specifically. I mean, it was – we knew it was going to be difficult, and it was very difficult." In response to a follow-up question from a Northcoast Research Partners LLC analyst regarding the impact of the recall on 2Q 2016 sales, Wine dodged the question, while admitting that the decline in July and August sales had been "precipitous":

I think – not I think.  The word that I used to drop the RZR impact in Q3 was precipitously dropped. The July and August decreases were hard to look at and it really had two factors.  I mean one is that there was just not products available for sale, and we had a stop-ride/stop-sale on Turbo for almost the entire month of August and part of September.

So it was dramatic.

143.    The additional promotions used to entice customers, such as discounts, vouchers and warranty extensions, further cut into Polaris' margins, as Defendant Speetzen acknowledged on the third quarter 2016 (the "3Q 2016") earnings call:

[M]argins were down 655 basis points reflecting lower volume and additional warranty and customer loyalty cost taken during the quarter as we indicated previously. The additional 490 basis points of warranty expense taken during the quarter includes the safety and service recall bulletins we've publicly announced, as well as expenses that are probable and estimable for quality issues being evaluated. Additionally, gross margins were negatively impacted by higher promotional and customer appreciation cost to bolster confidence and credibility

59

with our Off-Road Vehicle owners which is expected to be a multi-quarter activity. As Scott indicated, we are spending what is required to get the recall repairs completed effectively, along with putting processes and systems in place to improve the quality and safety of our vehicles going forward.

Despite these headwinds, we continue to make strong progress in our VIP cost improvement initiatives which help to offset a portion of these cost increases. For the full year 2016, gross margins are now expected to be down 380 basis points to 390 basis points compared to 2015.

This reflects the significant volume reduction in our very profitable off-road vehicle business, approximately 200 basis points of impact from the added warranty-related costs we have incurred and approximately 100 basis points of negative foreign-exchange impact for the full year.

Operating expenses are now expected to increase approximately 300 basis points as a percentage of sales given product liability, acquisition costs, legal and other recall-related costs incurred during the year.

144.    The October 25, 2016 call also revealed that defendants' prior representations about Polaris' commitment to quality and safety and the nature and sufficiency of, and level of spending on, its quality and safety programs had been false at the time they were made.  Defendant Wine admitted, for example, that, as a result of the recalls, the Company had "to elevate our quality expectations, and our financials reflect that."   Defendant Speetzen similarly acknowledged on the call that the Company would have to spend additional money on engineering as a result of the recall: "We will, however, spend more money in engineering resources and to continue quality and safety enhancements as well as ongoing innovation investments and expect that this will increase engineering costs mid-teens percent over 2016 levels." In response to an analyst question as to why the fire-related defects had not been disclosed earlier ("And then also in the case of the RZR 900s and RZR 1000s, why did these problems arise last year and into this year, and not three or four years ago?"), Defendant Wine admitted that "the reason that we didn't see it in 2013 and 2014 is that we didn't have the processes and tools to get the information from the field as quickly as we could and manage the information flow.  And, ultimately, it took us a while to recognize the trends."

145.    On October 27, 2016, the Individual Defendants caused Polaris to file its Form 10-Q for the period ended September 30, 2016 (the "10Q 3Q 2016"), which was signed by Defendants Wine and Speetzen, and included SOX certifications signed by these defendants.  The 10Q 3Q2016 indicated a jump in warranty reserve balance from $55.1 million for the three months ended September 30, 2015, to a remarkable $130.1 million for the three months ended September 30, 2016.  The 10Q 3Q 2016 made only scant reference to the increase, noting:

During 2016, the Company has incurred significant additions to the warranty reserve, primarily associated with recall activity for certain RZR ORVs. In April 2016, the Company issued a voluntary recall for certain RZR 900 and 1000 off-road vehicles manufactured since model year 2013 due to reports of thermal-related incidents, including fire, and in September 2016, the Company issued a voluntary recall for certain RZR XP Turbo off-road vehicles due to similar thermal-related incidents.

146.    The 10Q 3Q 2016 contained the following:

**Significant product repair and/or replacement due to product warranty claims or product recalls could have a material adverse impact on our results of operations.**

We provide a limited warranty for ORVs for a period of six months, for a period of one year for our snowmobiles, for a period of one or two years for our motorcycles depending on brand and model year, for a period of one year for its Taylor-Dunn vehicles, and for a two year period for GEM, Goupil and Aixam vehicles. We may provide longer warranties related to certain promotional programs, as well as longer warranties in certain geographical markets as determined by local regulations and market conditions. We also provide a limited emission warranty for certain emission-related parts in our ORVs, snowmobiles, and motorcycles as required by the EPA and CARB. Although we employ quality control procedures, sometimes a product is distributed that needs repair or replacement. Our standard warranties require us or our dealers to repair or replace defective products during such warranty periods at no cost to the consumer.

Historically, product recalls have been administered through our dealers and distributors. The repair and replacement costs we could incur in connection with a recall could adversely affect our business. For example, in April 2016, we issued a voluntary recall for certain RZR 900 and 1000 off-road vehicles manufactured since model year 2013 due to reports of thermal-related incidents, including fire, and in September 2016, we issued a voluntary recall for certain RZR XP Turbo off-road vehicles due to similar thermal-related incidents. In addition, product recalls could harm our reputation and cause us to lose customers, particularly if recalls cause

61

consumers to question the safety or reliability of our products.

147.    Numerous analysts noted the damage that had been caused to Polaris' reputation and market share. For example, *the Motley Fool* wrote in a January 6, 2017 research report that "the fact that the recalls have all been similar in nature – a fire hazard risk resulting from poor craftsmanship – and have spread across virtually all its product lines indicates a troubling lapse in management," adding that the recalls demonstrated an "inability to contain the recalls and get a handle on quality control."

## VII.  DAMAGES TO THE COMPANY

148.    As a direct and proximate result of the Individual Defendants' conduct, Polaris has been seriously harmed and such harm is continuing.  Such harm includes, but is not limited to the filing of the pending Class Action, the costs of investigation and expenses related to the recalls and numerous personal injury lawsuits and related actions against the Company.  The Company's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  As a result of the Individual Defendants' wrongful acts and omissions, and the declines in the market value of the Company's common stock during the Relevant Period, the Company has suffered damages.

149.    The ongoing nature of the harm that the Individual Defendants continue to cause Polaris is demonstrated, in part, by the ongoing recalls to which the Company has been subject. Indeed, on July 20, 2017, the Individual Defendants caused Polaris to host its conference call following the issuance of financial results for the second quarter of 2017.  During the call, the Defendants admitted the ongoing nature of the recalls and the costs to Polaris from such undertaking.  As stated on the call:

> [Wine] . . .Polaris is currently working with the appropriate agencies to review proposed corrective actions and release timing for a handful of pending recalls. These have been contemplated in today's revised guidance.

> ***

[Wine] Well, I mean, what went wrong was our growth slowed down. I mean, as you recall, we have not -- we didn't have a downshift in how we interacted with our dealers from, say, 2013, where we were ranked #1 consistently in almost every dealer survey, you did them, so you know. What happened from '13 to now is that our growth has slowed down significantly and we've thrown a lot of recall-related cost and pressure on our dealers. . . . .

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGTIONS

150.   Plaintiff brings this action derivatively in the right and for the benefit of Polaris to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants.

151.   Plaintiff will adequately and fairly represent the interests of Polaris and its shareholders in enforcing and prosecuting its rights.

152.   The Board currently consists of the following eight (8) Demand Directors: Wine, Clayton, Farr, Hendrickson, Henricks, Kessler, Kingsley, and Wiehoff, as well as non-party director George W. Bilicic.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

153.   During the Relevant Period, Demand Directors Farr, Kessler, Kingsley, Wiehoff and Henricks served as members of the Audit Committee (the "Audit Committee Defendants" as defined above).  Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls.  The Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee Defendants, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures.  Therefore, the Audit Committee Defendants each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

154.   Demand Directors Wine, Clayton, Farr, Kessler, Kingsley and Henricks served on the Technology Committee during the Relevant Period, which committee was tasked with, among

other things, "[m]onitoring the Company's quality initiatives to ensure that the quality of Polaris products meets or exceeds customer expectations and continues to strengthen the Polaris brand name." For this additional reason, Defendants Wine, Clayton, Farr, Kessler, Kingsley and Henricks each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

155.    The principal professional occupation of Demand Director Wine is his employment with Polaris as its Chief Executive Officer, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   In addition, according to the Company's Proxy Statements filed during the Relevant Period, Polaris and the Individual Defendants have admitted Wine is not independent.   Thus, defendant Wine lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action; and

156.    Each of the Demand Directors signed one or more of the materially false and misleading annual or quarterly reports filed with the SEC, as detailed herein.   Therefore, for this additional reason, each of the Demand Directors face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## IX.    COUNTS FOR RELIEF

### COUNT I

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158.    As alleged in detail herein, each of the Individual Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Polaris disseminated accurate, truthful and complete information to its shareholders.

159.    The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Polaris shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

160.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

161.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.    The Individual Defendants owed and owe Polaris fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Polaris the highest obligation of good faith, fair dealing, loyalty and due care.

163.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

164.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Polaris has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

165.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

166.    Plaintiff, on behalf of Polaris, has no adequate remedy at law.

## COUNT III

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

167.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Polaris.  Each of the Individual Defendants received cash compensation, equity awards and/or other financial benefits during the Relevant Period.

169.    Plaintiff, as a shareholder and representative of Polaris, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## COUNT IV

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL

170.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Polaris, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing Polaris to misrepresent material facts regarding its financial position and business prospects.

172.    As a direct and proximate result of the Individual Defendants' abuse of control, Polaris has sustained significant damages.

173.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

174.    Plaintiff, on behalf of Polaris, has no adequate remedy at law.

## COUNT VI

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT

175.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.    The Individual Defendants had a duty to Polaris and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Polaris.

177.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Polaris in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of Polaris's affairs and in the use and preservation of Polaris's assets.

178.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Individual Defendants caused Polaris to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Polaris, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged Polaris.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law detailed herein;

B.    Directing Polaris to take all necessary actions to reform and improve its corporate

governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to Polaris restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## X.     JURY DEMAND

Plaintiff demands a trial by jury on all issues.

Dated:  August 22, 2017          REINHARDT WENDORF & BLANCHFIELD

*s/Garrett D. Blanchfield, Jr.*
Garrett D. Blanchfield, Jr.
Atty. Reg. No. 209855
g.blanchfield@rwblawfirm.com
Roberta A. Yard
Atty Reg. No. 322295
r.yard@rwblawfirm.com
E1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, Minnesota  55101
Telephone:  (651) 287-2100
Facsimile:   (651) 287-2103

*Local Counsel*

68

HAEGGQUIST & ECK, LLP
AMBER L. ECK
 ambere@haelaw.com
KATHLEEN A. HERKENHOFF
 kathleenh@haelaw.com
AARON M. OLSEN
 aarono@haelaw.com
JENNA M. RANGEL
 jennar@haelaw.com
225 Broadway, Suite 2050
San Diego, CA 92101
Telephone: 619-342-8000
Facsimile: 619-342-7878

*Attorneys for Plaintiff*

## VERIFICATION

I, Marilyn Kelly, declare as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing.  The facts stated therein as to my ownership of Polaris Industries Inc. securities are true as to my own knowledge.   The remaining allegations in the Complaint are based upon information and belief and the investigation of my counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  *15*  day of August, 2017, at Gulf Breeze, Florida.


*Marilyn Kelly*
_____
MARILYN KELLY